The BANK OF NEW ORLEANS AND TRUST COMPANY

v.

MONCO AGENCY INCORPORATED, et al.

Civ. A. Nos. 82-2758, 83-2926.

United States District Court, E.D. Louisiana.

July 21, 1989.

Curtis Boisfontaine and Sally Shushan, Sessions, Fishman, Rosenson, Boisfontaine & Nathan, New Orleans, La., for plaintiff.

Frank Peragine, Christopher Guidroz and Judith Perhay, Simon, Peragine, Smith & Redfern, New Orleans, La., for defendants.

## MEMORANDUM OPINION

MENTZ, District Judge.

Before the Court is the motion of defendant, Arthur Young & Company (AYC), for reconsideration of the Court's Order of September 30, 1988, denying AYC's motion for summary judgment. The Court, after reviewing the motion, the memoranda and arguments of counsel, the record, and the law, grants AYC's motion for the reasons set forth below.

This is an action for negligent misrepresentation under Louisiana law. AYC, a firm of independent public accountants, was retained by defendant, Monco Agency, Inc. (Monco), to conduct an audit of Monco's financial statements for 1980. The 1980 audit report was issued on May 14, 1981. AYC had conducted such an audit for Monco each year since 1977. AYC was aware that Monco provided a copy of these audit reports to the First National Bank of Commerce (FNBC), Monco's sole major creditor, with whom Monco enjoyed a long term banking relationship. In 1977, Monco had borrowed from FNBC in excess of two million dollars on a five year note payable with interest at prime plus 1½ percent which required the personal guarantee of Mr. Oliver Stephen Montagnet, Jr., the president and chief operating officer of Monco. Mr. Montagnet, in an effort to obtain a loan which would not require his personal guarantee and which had a lower interest rate than the FNBC loan, began negotiations with plaintiff, The Bank of New Orleans and Trust Company (BNO), in early September, 1981. In conjunction with these loan negotiations, Monco provided BNO with a copy of its 1980 audit report prepared by AYC. In late 1981 and early 1982, BNO extended over $2,100,000.00 in credit to Monco. BNO did not require a personal guarantee on either note. Monco never made a payment on the BNO loans. By March of 1982, the Texas Department of Insurance had placed Monco into conservatorship.

BNO filed the instant action to recover its loss on the Monco loans. BNO alleges that it loaned the funds to Monco in reliance upon AYC's 1980 audit report of Monco which misrepresented the financial condition of the company. BNO's claim against AYC alleges negligent misrepresentation under Louisiana law, which has adopted the standards set forth in section 552 of the Restatement (Second) of Torts for this cause of action. On a prior date, AYC moved for summary judgment on the ground that it did not know that the 1980 audit report of Monco would be provided to BNO or any bank other than FNBC and, hence, is not liable to BNO under Louisiana law. By way of Order and Reasons dated September 30, 1988, the Court denied AYC's motion for summary judgment on the ground that "there is a genuine dispute of material fact regarding AYC's knowledge of the intended use of the 1980 audit report...." The Court believed that a jury could infer, based on the totality of the evidence, that AYC knew that Monco would distribute the 1980 audit report to banks other than FNBC. On reconsideration, the Court questioned whether section 552 of the Restatement (Second) of Torts:

(1) requires that AYC have actual as opposed to constructive knowledge of the persons who would receive the 1980 audit report and the nature of the proposed transaction, and (2) whether this knowledge may be proven by circumstantial as opposed to direct evidence.

Pursuant to the Court's directive, the parties filed memoranda on these issues. AYC contends that section 552 of the Restatement (Second) of Torts expressly articulates an actual, as opposed to a constructive knowledge standard, by limiting the maker of the information's liability to loss suffered:

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or *knows* that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or *knows* that the recipient so intends or in a substantially similar transaction.

Restatement (Second) of Torts, section 552 (emphasis added). AYC further argues that the actual knowledge standard set forth in the Restatement was applied in *Hot Boudin Co. v. Harrison Price Co.*, 842 F.2d 328 (5th Cir.1988), wherein the court stated: "The Restatement limits the class of persons entitled to recover from the negligent supplier of misinformation to persons the supplier knows will rely on the information. While this duty may extend to an unnamed group, it is not enough that the supplier 'merely knows of the ever-present possibility' that the information will be repeated to others who will rely on it." *Id.* at 6 [842 F.2d 328 (table)] (quoting Restatement (Second) of Torts, § 552 (1977). Accordingly, the *Hot Boudin* court refused to hold Harrison Price, the maker of a projection study for the World's Fair, liable to concessionaires who relied on the attendance projections in the report:

Harrison Price completed its projection studies in November and December 1980, long before the appellants became concessionaires at the World's Fair. While it is possible that Harrison Price had

reason to expect that lenders, creditors, concessionaires, and other parties could potentially rely on the projection study, imposing liability to such an undefined, unlimited class of potential users would radically expand exposure for negligent misrepresentation and seriously discourage exchange of information.

*Id.* at 7 [842 F.2d 328 (table)]. Based on the foregoing, AYC claims that this Court must determine whether AYC had actual knowledge of the persons or class of persons to whom Monco intended to distribute the 1980 audit at the time AYC issued the report. AYC believes that the "should have known" phraseology is merely another way of stating the constructive knowledge standard which is rejected by section 552 of the Restatement.

Additionally, AYC argues that section 552 requires that the maker's knowledge of the intended use of the information be manifest and actual. The Restatement explains that it imposes liability "only in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended to supply it for that purpose." Restatement Second of Torts, section 552, comment a.

Regarding the issue of direct versus circumstantial evidence, AYC concedes that inference or circumstantial proof may be used to determine the persons for whose benefit and guidance the information is supplied. However, AYC believes that "knowledge of the unidentified third party (and a concomitant duty of care) may be inferred ... only ... *from the supplier's actual knowledge* of the transaction intended by the recipient and of the recipient's intention to use the supplier's information to induce or consummate the transaction with a limited group of persons." *See* AYC's Supplemental Memorandum in Support of Motion for Summary Judgment, at 11.

In contrast, BNO argues that it may use direct and circumstantial evidence to prove that AYC had actual or constructive knowledge of the persons who would receive the 1980 audit and the transaction in which the audit report would be used. The only case

BNO cites in support of its position is *Hot Boudin*,[1] which BNO argues "does not provide a narrow interpretation of section 552 requiring that there be 'manifest actual knowledge of the proposed transaction.' *Hot Boudin* implicitly recognize[d] that liability may be based on constructive knowledge as it found that a supplier's duty may extend to an 'unnamed group.'" *See* BNO's Reply Memorandum to AYC's Supplemental Memorandum in Support of its Motion for Summary Judgment, at 4. (quoting *Hot Boudin, supra* at 6 [842 F.2d 328 (table)]). To require actual knowlege of the intended use and recipient of an audit report, BNO claims, would have to come from a "confession."[2]

The Court recognizes that the standards set forth in section 552 of the Restatement (Second) of Torts represents a middle ground between the restrictive *Ultramares*[3] approach, which requires privity of contract as a condition for recovery in tort against an accountant for negligence, and the expansive "reasonably foreseeable" approach, which extends accountants' liability to all reasonably foreseeable uses of the information. The Restatement takes the position that an accountant may be liable to a third party with whom the accountant is not in privity for negligence in the preparation of a financial statement if the accountant knows and intends the third party to rely on the information or knows the client intends the third party to so rely. Courts have not been uniform in defining the scope of accountants' liability to non-clients under the Restatement. *See generally* R. Gormley, *The [Actually] Foreseen, The Foreseeable, and Beyond—Accountants' Liability to Non-clients,* 14 Seton Hall L.Rev. 528 (1984).

This Court, after carefully reviewing the arguments of the parties and the applicable law, finds as follows:

■ 1. Section 552(a) requires that the maker of the information have *actual knowledge, at the time it issued the allegedly negligent information,* of the person or limited group of persons to whom the recipient intends to supply the information. This ruling is compelled by *Hot Boudin* and the plain language of the Restatement, both of which require that the maker "know" of the person or group of persons who are the intended users of the information. Therefore, the Court rejects the "reason to know" or "should know" standards advanced by BNO. The Court's finding that actual knowledge is required by the Restatement is buttressed by the fact that the definition section of the Restatement (Second) of Torts defines the terms "reason to know" and "should know,"[4] thereby in-

---

1. BNO's original memorandum in opposition to AYC's motion for summary judgment does not address the issue of actual versus constructive knowledge or direct versus circumstantial proof. Further, though BNO relies upon *Hot Boudin* in its supplemental memorandum, BNO generally believes that *Hot Boudin* is inapposite to the case at bar because the Louisiana World Exposition, Harrison Price's client, issued a disclaimer instructing the concessionaires not to rely on the information. However, we find that the court's evaluation of Harrison Price's liability to the concessionaires in *Hot Boudin* was not based in any way on the disclaimer made by its client.

2. AYC responded to this contention by noting the following forms in which direct evidence of AYC's knowledge of the BNO loan could be proven: 1) testimony by Monco representative that they told the auditors the year in question that they intended to use the report to apply for a new bank loan; 2) minutes of meetings of Monco's board of directors authorizing new loans; and 3) letters or other memoranda evidencing the intention of Monco's officers to use the 1980 report to obtain new bank loans. AYC notes that BNO has not produced any such testimony or documents pertaining to the 1980 audit report.

3. *Ultramares Corp. v. Touche, Niven & Co.,* 255 N.Y. 170, 174 N.E. 441 (1931). The requirement of privity of contract as a condition for recovery in tort against an accountant for negligence is based on the famous case of *Winterbottom v. Wright,* 152 Eng.Rep. 402 (1842).

4. Section 12 of the Restatement (Second) of Torts reads:

   Reason to Know; Should Know
   (1) The words "reason to know" are used throughout the Restatement of this Subject to denote the fact the actor has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists.

dicating that "know" has a different definition. Clearly, the use of the word "know" and the absence of the words "reason to know" or "should know" in section 552 is intentional and significant.

The Louisiana cases on negligent misrepresentation do not specifically address the knowledge issue and, in fact, recognize that "negligent misrepresentation as a legal remedy is in its infancy in Louisiana." *Josephs v. Austin,* 420 So.2d 1181, 1185 (La.App. 5th Cir.1982). Nevertheless, in each of the Louisiana cases on negligent misrepresentation wherein section 552 of the Restatement (Second) of Torts was applied, the defendant's liability was based upon his actual knowledge. *See* Id. at 1185; *Dousson v. South Central Bell,* 429 So.2d 466, 468 (La.App. 4th Cir.1983); *Beal v. Lomas and Nettleton Co.,* 410 So.2d 318, 321 (La.App. 4th Cir.1982). Though previous to these decisions, the Louisiana Supreme Court in *Devore v. Hobart Mfg. Co.,* 367 So.2d 836 (La.1979), implied that a "know or should have known" standard applied, this reference was dicta. *Devore* affirmed the dismissal of the petition on the exception of no cause of action because plaintiff made "no allegation" of facts to establish defendant's knowledge. Because of the complete absence of this allegation, the court stated that "[i]t cannot be presumed that the [supplier of the information] knew or should have known that [plaintiff] ... would rely entirely upon the information furnished...." *Id.* at 839.

Though there is a discrepancy between the knowledge standard applied by the Louisiana Courts of Appeals and mentioned in dicta by the Louisiana Supreme Court, it is not disputed that Louisiana follows section 552 of the Restatement (Second) of Torts on negligent misrepresentation. Since section 552 specifically uses the word

"know" as opposed to "should know" or "reason to know," the Court concludes that BNO must prove that AYC knew the person or limited group of persons who would receive the 1980 audit report of Monco to impose liability for negligent misrepresentation under Louisiana law.

■ 2. Section 552(a) extends the maker's duty of care to an unnamed user where that user is a member of a specific limited group whom the maker knows will use the information and the specific name of the user is not significant to the transaction. Circumstantial evidence may be used to establish that the maker knew the plaintiff is a member of this limited group of users. *See* Restatement (Second) of Torts, comment h; *Hot Boudin, supra,* at 6 [842 F.2d 328 (table) ]. Conversely, where the maker of the information is informed of the identity of a definite person to whom the recipient intends to transmit the information (such as in the case at bar where it is undisputed that AYC knew that FNBC would receive the 1980 audit as a requirement for its loan to Monco), an unnamed third person may recover where the named person was only "one of a group whom the information was intended to reach and for whose guidance it was being supplied." *See* Restatement (Second) of Torts, section 552, comment h.

3. In addition to section 552(a)'s requirement that the maker know the person or limited group who will rely on the information, section 552(b) requires that the maker also "know" the transaction in which the information will be used, unless substantially similar transactions are involved.

■ With these legal principles in mind, the Court will now examine the facts which form the basis of BNO's lawsuit to determine whether there are any material facts

(2) The words "should know" are used throughout the Restatement of this Subject to denote the fact that a person of reasonable prudence and intelligence or of the superior intelligence of the actor would ascertain the fact in question in the performance of his duty to another, or would govern his conduct upon the assumption that such fact exists. The distinction between these terms is explained in the comment. Though the Restate-

ment does not define the word "know," Webster defines "know" as follows: "to perceive with understanding and conviction, ... to be appraised of; to have or acquire information about or cognizance of; as to know the circumstances...." Webster's Int'l Dictionary (2nd ed. 1944). This is clearly a more narrow standard than the Restatement's definition of "reason to know" or "should know."

in dispute. AYC concedes that it knew that the 1980 audit report would be given to FNBC, the U.S. Treasury Department, shareholders, directors, and officers of Monco, and insurance commissions in each of the states where Monco or its affiliate, Cotton Belt Insurance Company (CBIC), was licensed to underwrite bond business or was attempting to obtain licensing. However, AYC contends that there is no evidence that: 1) AYC intended to supply its 1980 audit report of Monco for BNO's guidance or the guidance of a group of banks of which BNO was a member for the purpose of obtaining new, additional, or replacement financing or 2) that AYC knew that Monco intended to supply the 1980 report to BNO or banks other than FNBC for this purpose. In support of this contention, AYC submits various depositions and affidavits of Monco and CBIC officers wherein they testify that they never told AYC that BNO or any bank other than FNBC would receive the 1980 audit of Monco. Further, Steve Montagnet, Jr. testified that at all times prior to the extension of credit by BNO, his discussions with BNO were intended to be and were kept confidential and that AYC was not aware that such negotiations were in progress or that Monco was looking for new, additional, or replacement financing with any bank. Affidavit of O. Stephen Montagnet, Jr. dated June 6, 1988. The Court has reviewed this evidence and finds that AYC has adequately supported its motion for summary judgment as required by Federal Rule of Civil Procedure 56.

In opposition, BNO submits a statement of material facts which it contends requires a trial on the merits. The Court will examine each of BNO's five contested facts to determine whether the evidence supports BNO's factual conclusions and, if so, determine whether these facts are relevant under the applicable law.

BNO's Fact No. 1: "Arthur Young & Company ("AYC") was aware that the 1979 AYC audit report was being disseminated to the current Monco lender, FNBC, and in addition was being forwarded to at least two other potential lenders. (Deposition excerpts of John Herbert, Treasurer of Monco, attached as exhibits "1", "2", and "4")."

BNO cites page 105 of the deposition of Mr. John Herbert (BNO's Exhibit 1) for the proposition that "Montagnet was always looking for a banking institution that would grant Monco a loan without requiring his personal guarantee." Memorandum in Opposition to AYC's Motion for Summary Judgment, at 4. However, the court has reviewed the entire relevant pages of the deposition [5] and finds no evidence indicating that this information was communicated to AYC or that AYC knew of this fact. *See* depo. of Herbert at 102, 105, 126, 129, 269. The only evidence of AYC's knowledge that Monco was interested in negotiating a loan with banks other than FNBC is found on pages 268–69 of Mr. Herbert's deposition (BNO's Exhibits 2 and 4). There, Mr. Herbert, when asked why Monco, in May of 1980, requested thirty-five copies of AYC's 1979 audit of Monco,[6] answered that CBIC was expanding and applying to write bail business in additional states and that Monco had to send copies of its financial status to insurance regulatory agencies in those states. Mr. Herbert also stated that he sent a copy of the 1979 report to "the bank" [FNBC], the treasury, and each of the directors of Monco. When asked whether anyone else received a copy of the 1979 audit, Mr. Herbert stated that Security Pacific Bank and Hibernia Bank also received a copy of the 1979 audit. Monco was "having discussions with them to see if they would like to take over the loan." Depo. of Herbert at 269. When asked whether he told Mr. Lefranz, the AYC representative who worked

---

**5.** On reconsideration, the Court requested that BNO submit the first three hundred pages of Mr. Herbert's deposition in order to examine the testimony BNO relies on in the context of the deposition and to determine more precisely whether any evidence of AYC's knowledge can be inferred from Mr. Herbert's statements.

**6.** BNO's Exhibit 3 is a letter from Mr. Lafranz of AYC to Mr. Herbert establishing that AYC sent Monco thirty-five copies of the 1979 audit report on May 12, 1980.

on the 1979 audit, why he wanted 35 copies, Mr. Herbert responded, "Yes."

The allegedly false information at issue in this lawsuit is contained in the *1980* audit report. There is no evidence that Arthur Young was told that the 1980 audit report would be given to banks other than FNBC. AYC's knowledge of Monco's intended use of the 1979 audit report is relevant only if there is evidence that Monco made representations regarding the use of the 1979 report to Hibernia and Security Pacific from which a jury could find that Arthur Young knew that the 1980 audit report would be distributed to banks other than FNBC. There is no evidence of this in the case at bar. Absent such evidence, Mr. Herbert's testimony regarding the 1979 report is irrelevant.

BNO's Fact No. 2: "AYC knew or should have known that further concessions and further extensions of credit would be granted to Monco based on AYC's unqualified audit report (Deposition excerpts of John Bailey, attached as exhibits "5", "6", "7", and "8")."

BNO's exhibits 5, 6, 7, and 8 establish that Monco requested and received fifty copies of AYC's 1980 audit of Monco without telling AYC anything as to the use or distribution of these reports. John Bailey, the AYC partner in charge of the 1980 audit, stated that he was never told why Monco wanted fifty copies of the 1980 audit. However, the fact that fifty copies of the 1980 audit were requested does not establish that AYC knew that banks other than FNBC would receive the report. As of the end of 1979, CBIC was doing business in twenty-two states and had made or was making application to write bonds in fourteen additional states. *See* the Tennessee Department of Insurance report on CBIC as of December 31, 1979, attached as Exhibit A to Montagnet's Affidavit attached to AYC's Motion for Reconsideration. Thus, even as of 1979, Monco needed thirty-seven copies of the 1979 report solely

for regulatory purposes (1 federal and 36 state agencies). It has also been established that Steve Montagnet was persistently seeking to expand CBIC's underwriting authority into more states. *See* depo. of Herbert at 63. In addition, copies were distributed to FNBC and the Monco directors (approximately six in number), as AYC expected. *See* depo. of Bailey at 273. Thus, the fact that Monco requested fifty copies of the 1980 audit does not prove that AYC knew that banks other than FNBC would receive copies of the 1980 audit for new, additional, or replacement financing.[6]

BNO Fact No. 3: "AYC knew that FNBC was relying on the AYC audit reports in granting concessions to Monco, and, that as a significant creditor, FNBC or any other Monco lender would suffer losses in the event AYC issued a false and misleading report. (Deposition excerpts of George Daigle, attached as exhibits "10" and "11", and also letter from FNBC to Montagnet attached as exhibit "12")."

The deposition of George Daigle, the AYC audit manager for the 1980 audit, only establishes that AYC knew that FNBC required annual, audited financial statements in connection with its loan to Monco. The letter from FNBC to Montagnet merely establishes that AYC knew that in March 1981 FNBC reduced Monco's interest rate for some reason not stated in the letter. Both of these facts are not disputed by AYC. Neither of these facts are evidence from which a jury could find that AYC knew that its 1980 audit report would be given to banks other than FNBC for new, additional, or replacement financing.

BNO's Fact No. 4: "AYC knew or should have known that Monco was seeking financing on more favorable terms from FNBC, and, if FNBC denied those terms, from other lending institutions, and in that regard had provided prospective lending institutions with the 1980 AYC audit report. (Deposition of George Dai-

---

**6.** In my experience, it is certainly foreseeable that a client who orders fifty copies of an audit report will use that report in connection with its lines of credit, either existing or contemplated. However, the Court feels that it must follow the wording of the Restatement, which does not impose a duty to supply accurate information to all foreseeable users. *See e.g.* Restatement (Second) of Torts, § 552, Comment h, Illustration 10.

gle, supra, as well as deposition of John Herbert, supra.)."

Arthur Young admits that it knew Monco wanted more favorable terms from its existing lender, FNBC. Arthur Young believes that this fact is not relevant because most borrowers desire more favorable terms on their loans.

The Court finds that this evidence does not create a genuine issue of material fact regarding whether the 1980 audit report would be given to "other prospective lending institutions" sufficient to impose liability under section 552 of the Restatement (Second) of Torts. As previously explained, Mr. Daigle's deposition only establishes the undisputed fact that AYC was aware that FNBC required audited financial statements of Monco as a condition of the loan. At his deposition, he also testified that AYC was aware of "a disagreement between Mr. Herbert interpreting the loan agreement and the bank interpreting the loan agreement." That is the extent of Mr. Daigle's testimony.

Also as previously explained, Mr. Herbert only testified regarding Monco's intended use of the *1979* audit report. There is no indication in his testimony that AYC was told that the 1980 audit report would also be distributed to banks other than FNBC. In fact, Monco's negotiations with BNO *did not begin* until 3½ months *after* AYC issued its 1980 audit report on May 14, 1981. *See* Statement of Undisputed Facts, No. 9.

The Restatement requires that the auditor possess knowledge of the intended use of the report at the time the report is issued.[7] Thus, AYC is only liable for legal consequences flowing from the knowledge it possessed on or before May 14, 1981, of Monco's intended use of the 1980 audit report. The fact that Monco had been given an adjustment on its loan with FNBC in March 1981 and that a "disagreement" between Monco and FNBC arose in April of 1981 regarding the interpretation of the loan agreement does not mean that AYC knew that Monco would give the 1980 audit report to "other prospective lenders," even though AYC allegedly knew that Monco had given two banks other than FNBC a copy of the 1979 report to negotiate a loan. Such a deduction involves pure speculation. It does not even rise to the "should have known" standard advanced by BNO. The very fact that FNBC previously had revised the terms of the loan in Monco's favor implies that FNBC was willing to negotiate with Monco and grant Monco concessions on the loan. There is no evidence that AYC knew that Monco would seek financing from another bank. Thus, the Court finds that, based on the evidence submitted by BNO, reasonable minds could not differ on the conclusion that AYC did not know that the 1980 audit report would be submitted to banks other than FNBC for new, additional, or replacement financing.

> BNO's Fact No. 5: "BNO was a member of the limited class of potential Monco lenders to whom AYC owed a duty to issue an accurate audit report. (Deposition excerpts of John Herbert, George Daigle, and John Bailey, *supra* )."

As recognized by AYC, this is not a factual statement; it is a conclusion of law. It is not, therefore, an evidentiary fact in dispute.

In ruling on a motion for summary judgment,

> the judge must ask ... whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

.    .    .    .    .

---

7. *See Hot Boudin, supra,* at 7 [842 F.2d 328 (table) ] ("The district court correctly concluded that Harrison Price was under no duty to supply appellants with correct information. Harrison Price completed its projection studies in November and December 1980, long before the appellants became concessionaires at the World's Fair." For other cases which evaluated the auditor's knowledge, as of the time it issued the audit report, *see Raritan River Steel v. Cherry, etc.,* 322 N.C. 200, 367 S.E.2d 609, 618 (1988); *Ryan v. Kanne,* 170 N.W.2d 395, 403 (Iowa 1969); *Briggs v. Sterner,* 529 F.Supp. 1155, 1177 (S.D.Iowa 1981).

[Further,] the determination of whether a factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 2514, 91 L.Ed.2d 202 (1986).

Based on the foregoing, the Court finds that there are no genuine issues of material fact in dispute which require a trial on BNO's claim against AYC and hereby reverses its original ruling on AYC's motion for summary judgment. Initially, the Court held that "there is a genuine dispute of material fact regarding Arthur Young's knowledge of the intended use of the 1980 audit report" because "based on section 552 of the Restatement (Second), ... Arthur Young is liable to BNO as long as Arthur Young was not told that the 1980 audit report would be supplied to FNBC only. *See* Illustrations 6 and 8 of the Restatement (Second), § 552." Order dated September 30, 1988, at 2. In Illustrations 6 and 8, the supplier of the information was told that negotiations (for a new loan or a purchase of a car, respectively) were underway. However, upon re-examining the facts, the Court must conclude that the evidence does not establish that AYC knew that Monco was negotiating with banks other than FNBC for new or replacement financing or that Monco would supply its 1980 audit report for such a purpose. Therefore, Illustrations 6 and 8 are inapplicable. The supplier of the information in those illustrations knew that a transaction was being contemplated or negotiated which would involve dissemination of the information. In the case at bar, there was no such knowledge by AYC.

■ Though the Court finds that there are no material facts in dispute, the Court must address a novel legal argument advanced by BNO before it can determine whether AYC is entitled to summary judgment as a matter of law.

BNO argues that:

In stepping into the shoes of FNBC and in granting an identical loan to Monco as had been granted by FNBC, [BNO] is a member of the 'group or class of persons' who AYC intended its audit report to reach, even though AYC did not specifically know that BNO would take over the FNBC–Monco loan. There is no doubt that AYC knew of the existing FNBC loan, knew of FNBC's reliance on the AYC audit report, and knew that if it supplied false information for the guidance of FNBC that FNBC would be damaged thereby. By stepping into FNBC's shoes, the risk involved in supplying false information was then transferred to any potential loss by BNO when the false information was supplied through the AYC report, even though AYC had not heard BNO's name mentioned by Monco. Thus, BNO, in replacing FNBC as Monco's primary lender, and in granting a loan to Monco on almost identical terms as were granted by FNBC, was within the ambit of persons for whose benefit and guidance AYC intended to supply the audit report. . . .

BNO's Memorandum in Opposition to AYC's Motion for Summary Judgment at 10–11.

Perhaps there is arguable merit to a "stepping into another's shoes" argument if in fact the new lender merely assumed the existing loan. The Restatement only requires that the transactions be substantially similar or that the maker of the information have manifest knowledge of the *use* to which the information will be put. Further, the Restatement does not require the maker to know the name of the plaintiff as long as the maker knows the group of intended recipients. *See* Restatement Second of Torts, section 552, comments a and h. In such a situation, the same loan is in effect and the risk of liability to which the maker is exposed is unaltered. However, in the case at bar, BNO did not merely assume the FNBC loan or receive an assignment without recourse. BNO granted Monco an entirely new loan. *See* affidavit of Stephen Montagnet, Jr. Therefore, the Court finds no merit in BNO's argument that it merely assumed the FNBC loan and should be able to "step into FNBC's shoes."

Applying the standards set forth in section 552 of the Restatement (Second) of Torts and *Hot Boudin, supra,* to the facts before the Court, we are compelled to find that AYC was under no duty to supply BNO with an accurate report of Monco's financial status.

Accordingly,

IT IS ORDERED that Arthur Young & Company's motion for reconsideration is GRANTED.