**FIRST NATIONAL BANK OF COMMERCE (formerly the Bank of New Orleans & Trust Company), Plaintiff–Appellant,**

v.

**MONCO AGENCY INCORPORATED, Defendant,**

**Arthur Young & Company, Defendant–Appellee.**

No. 89–3734.

United States Court of Appeals, Fifth Circuit.

Sept. 14, 1990.

Curtis R. Boisfontaine, Sally A. Shushan, John W. Hite, III, Sessions, Fishman, Boisfontaine, Nathan, Winn, Butler and Barkley, New Orleans, La., for plaintiff-appellant.

John J. Gill, Gen. Counsel, Michael F. Crotty, Depty. Gen. Counsel, Washington, D.C., for amicus-Am. Bankers Assoc.

Mary E. Arceneaux, Baton Rouge, La., for amicus-LA. Bankers.

Christopher Guidroz, Frank Peragine, Simon, Peragine, Smith & Redfern, New Orleans, La., for defendant-appellee.

Robert J. Conrad, Jr., Adams & Reese, New Orleans, La., for amicus-Soc. of La. CPAs.

Louis A. Craco, Willkie Farr & Gallagher, Deborah E. Cooper, New York City, Diana B. Simon, Washington, D.C., for amicus-Am. Inst. CPA.

Before THORNBERRY, GEE, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

A bank maintains that an accounting firm negligently misrepresented the financial resources of a client of the firm in a 1980 audit report, upon which the bank relied to its detriment in extending a $2.1 million commercial loan. The client defaulted on the note immediately and remains insolvent, thus shifting the focus of this litigation from the defunct debtor to the accountants. Specifically, the bank seeks to recover on the bad debt from the firm that unqualifiedly attested to the accuracy of the financial statements.

We conclude that Louisiana law does not protect every reasonably foreseeable consumer of inaccurate auditing information. Indeed, accountants do not insure the unfortunate commercial decisions of non-clients where, as here, the auditors never actually knew that their work product—an annual audit—would be relied upon by the bank in assessing the creditworthiness of its client. Since no legal duty has been breached under the facts of this case, we affirm the summary judgment.

## I.

In 1977, Monco Agency, Inc. (Monco), applied for a commercial loan from the First National Bank of Commerce (FNBC) to acquire Cotton Belt Insurance Company (CBIC). FNBC agreed to extend credit in excess of $2 million for purposes of the commercial acquisition, provided Monco would supply professionally audited financial statements annually to FNBC. To comply with this requirement, Monco retained Arthur Young & Company (Arthur Young), a firm of certified public accountants, to conduct annual audits of Monco and CBIC.

The 1977 Monco–FNBC loan was secured by a five-year note personally guaranteed by several individuals, including Monco's president and chief executive officer, Oliver Montagnet. The 1977 loan was subse-

quently modified, with FNBC agreeing to reduce the interest rate on the note and the number of personal loan guarantors. However, FNBC expressly declined to release Montagnet as a guarantor.

During 1977–81, FNBC remained Monco's principal creditor. It is undisputed that Arthur Young conducted four annual audits, with the knowledge that FNBC would use the audited financial statements in deciding whether to grant and modify the Monco–FNBC loan. However, in September 1981, over three months after Arthur Young issued its 1980 Monco audit, Montagnet entered private negotiations with the Bank of New Orleans & Trust Company (BNO) in an effort to secure a loan more favorable than that available from FNBC and, in particular, a loan that would release Montagnet as guarantor of his company's debt. Monco accordingly supplied BNO with the 1980 audit report, but Arthur Young was unaware of the negotiations between Monco and BNO to secure refinancing, and it did not know that its 1980 audit would be used for purposes of credit assessment by BNO.

In November 1981, Monco's creditworthiness was established to BNO's satisfaction. BNO thus extended a $1.6 million loan that, two months later, increased to $2.1 million. Monco liquidated FNBC's note and substituted BNO as the principal creditor on a loan that earned interest at a rate materially lower than that called for in the FNBC loan. Significantly, the BNO–Monco loan was structured so that Montagnet was not a guarantor.

Monco never made payment on the BNO note, defaulting immediately. In March 1982, ten months after Arthur Young issued its 1980 audit report, state insurance regulators declared CBIC insolvent and placed it into receivership. Monco subsequently ceased business operations and has failed to pay any portion of the outstanding $2.1 million loan or any interest thereon.

This action to recover on the debt then commenced against Monco and Montagnet.[1] In 1983, over a year after Monco's

---

1. Since Montagnet had been released as a guarantor, the complaint was framed in terms of a rule 10b–5 federal securities fraud violation.

loan default, FNBC merged with BNO for reasons irrelevant to this action. Thus, as a consequence of restructuring, FNBC now stands as the plaintiff in this action seeking recovery on the very loan that its own credit department declined to extend to Monco years earlier.

The bank joined Arthur Young in this action in 1984 pursuant to a third amended complaint, and discovery has been extensive. Arthur Young moved for summary judgment in June 1988 on the ground that it did not know that the 1980 Monco audit would be provided to BNO—or any bank other than FNBC—and that Louisiana law requires such knowledge. That motion was denied because, as the court reasoned, material factual issues remained concerning Arthur Young's knowledge of the future dissemination and intended use of its 1980 audit.

On Arthur Young's motion to reconsider summary judgment, the scope of Restatement (Second) of Torts § 552 (1977) became more evident to the court, which concluded that section 552 is the informational tort model applied by Louisiana courts in negligent misrepresentation actions. *BNO v. Monco*, 719 F.Supp. 1328, 1331–32 (E.D.La. 1989). The court then reversed itself, holding that to be liable, accountants must have actual knowledge of the identity of nonclients that will rely upon the audit and actual knowledge of the nature of the transaction that the accountants' work product will influence.

The facts alleged by BNO, the court maintained, failed to raise a genuine issue regarding Arthur Young's actual knowledge when the 1980 audit was issued on May 14, 1981. Further, the district court concluded that the FNBC–Monco and BNO–Monco loans were not "substantially similar transactions," as required by the Restatement to hold auditors liable for pecuniary damages sustained by nonclients.

On appeal, FNBC maintains that its acquiree, BNO, would not have made the $2.1 million loan to Monco but for the accountants' unqualified 1980 fiscal report, which allegedly misrepresented the company's financial strength. It insists that under Louisiana's negligent misrepresentation law, accountants need to have only *constructive* knowledge that their inaccurate audits will be relied upon to the detriment of potential lenders, as well as constructive knowledge of the nature of the transaction to follow.

The bank places great significance upon the fact that fifty copies of the 1980 audit were requested by Monco, as compared with thirty-five copies of the 1979 audit. The additional reports, we are told, evinces Monco's design to distribute the audit to assorted potential lenders. The bank further suggests that Arthur Young knew that the preceding year's 1979 audit was supplied to at least two banks other than FNBC and that Arthur Young *should have known* that Monco was seeking replacement financing by using the following year's audit.

Arthur Young argues, and the district court agreed, that Louisiana's jurisprudence adheres to section 552 for negligent misrepresentation in the commercial context. That being so, the Restatement requires that the misrepresenter have actual knowledge of the intended consumers of the audited financial statements, which become a fixed group the moment the information is publicly disseminated. Further, the accountants must actually know that the auditing information will be supplied by their client to a particular group of nonclients for purposes of undertaking a transaction *known* in advance by them.

Arthur Young admits that it actually knew that its 1980 audit would be supplied to FNBC, the United States Treasury Department, shareholders, directors, and officers of Monco, and insurance commissions in each of the thirty-six states where Monco or CBIC operated. However, it disavows any knowledge that BNO, or any bank other than FNBC, would rely upon the audit. Further, it maintains that it never knew of the business agreement between Monco and BNO to replace the FNBC loan until after the transaction was

completed, which occurred after the issuance of the 1980 audit.

Four amici curiae have filed briefs in this case, two of which represent banking associations and two of which represent professional accounting associations.[2] The amicus briefs, in the case of the banking associations, emphasize the public policy considerations weighing in favor of extending accountants' liability to the "reasonably foreseeable" limits adopted by some states. Predictably, the professional accounting associations emphasize the advantages of determinate liability for accountants, as recognized by the Restatement.[3]

## II.

### A.

In reviewing a summary judgment on appeal, we apply the same standard as the district court. *Waltman v. International Paper Co.*, 875 F.2d 468, 474 (5th Cir.1989). Specifically, if the pleadings, depositions, admissions, answers to interrogatories, and affidavits demonstrate that no genuine issue of material fact remains, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

Neither party disputes that the substantive law of Louisiana applies in this diversity action. Thus, Louisiana law identifies which facts are "material." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Further, this dispute is factually "genuine" if the direct and circumstantial evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *See id.*

■ The standard of review for summary judgment mirrors that applied to directed verdicts. *Id.* at 250, 106 S.Ct. at 2511. A mere scintilla of evidence in support of the plaintiff's position is insufficient to survive summary judgment. *Slaughter v. Allstate Ins. Co.*, 803 F.2d 857, 861 (5th Cir.1986) (citing *Liberty Lobby*). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted).

### B.

■ In recent years, litigation against accountants has accelerated, a phenomenon witnessed generally by other professions,[4] as courts redefine the legal obligations of professionals to the public and modify traditional notions of immunity.[5] Notably, some courts have been willing to hold accountants responsible for pecuniary damages incurred by nonclients, despite the fact that accountants may never have intended the public dissemination of their

---

2. The Louisiana Bankers Association and American Bankers Association align themselves with the bank's position; the Society of Louisiana Certified Public Accountants and the American Institute of Certified Public Accountants reinforce the arguments of the firm. We are indebted to these amici for their helpful comments.

3. Since this case is decided on the basis of Louisiana tort principles, we are not at liberty to fashion tort remedies that some may view as desirable in enforcing the professionalism of accountants. *See, e.g.,* Achampong, *Common Law Liability of Accountants for Negligence to Non-Contractual Parties:* Recent Developments, 91 Dick.L.Rev. 677, 691–92 (1987), *reprinted in* 37 Def.L.J. 203, 218–19 (1988) (accountants must be deterred from causing financial disasters with impunity). Accordingly, to the extent that the amicus briefs emphasize what Louisiana law *should be,* they are of little value in resolving this case, and we express no view as to this policy question. We sit as an *Erie* court in this case and only describe what we believe the state's law to be.

4. *See* Note, *What Standard of Care Should Govern the World's Shortest Editorials?: An Analysis of Bond Rating Agency Liability,* 75 Cornell L.Rev. 411 (1990) (anticipating extension of accountants' liability to bond-rating agencies).

5. Litigation involving accountants has recently become more pronounced as a consequence of this nation's savings and loan crisis. *See* Tucker & Eisenhofer, "Accountants' Liability: Negligent Representation Suits Multiply in Wake of S & L Crisis," Nat'l L.J., June 25, 1990, at 17 (The Federal Deposit Insurance Corporation, for example, is actively engaged in over a dozen civil suits against accounting firms, seeking more than $2 billion in damages.).

work product.[6] Courts leading the so-called reform effort view the expansion in liability as, among other things, a formula to deter malpractice and a mechanism to redistribute losses incurred by innocent public consumers of audited financial information.

Naturally, a client may sue its accountants for negligent misrepresentation, since there is privity of contract. Beyond this simple scenario, however, the states are generally divided three ways regarding which *nonclients* may sue accountants because of inaccurate audits. The lack of uniformity among the states is attributable to a schism in public policy regarding the measure of liability accountants should bear in favor of third parties for the business errors attributable, in whole or in part, to their work product.

The situation is complicated by the fact that the interests of management, the financiers of the work product, are not necessarily consonant with those of the public. Management seeks to maximize stockholders' and creditors' confidence in the company, within the bounds of the accounting profession's Generally Accepted Accounting Principles (GAAP)[7] and Generally Accepted Auditing Standards (GAAS); whereas, the public demands a sober and impartial evaluation of fiscal performance.

The restrained view of accountants' liability is represented by New York's seminal case, *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931) (Cardozo, C.J.). The *Ultramares* court held that accountants are immune from negligence suits prosecuted by third parties with whom the accountants are not in *contractual privity.* The court maintained that a contrary rule might "expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class" as a consequence of a thoughtless slip or blunder. *Id.* at 179, 174 N.E. at 444. The *Ultramares* rule informed this area of tort law for decades, foreclosing relief from inaccurate audits by nonclients.

*Ultramares's* strict privity rule was recently modified in *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985), to expand relief to third parties enjoying a relationship to the professional accountants that "sufficiently approaches privity." *See id.* at 554, 493 N.Y.S.2d at 445, 483 N.E.2d at 120. Thus, New York's restrictive view, as currently fashioned, holds accountants liable to nonclients, but only if the accountants *actually know* that their financial reports are to be used for a particular purpose. Additionally, the accountants must *actually know* that a nonclient is expected to rely upon the financial reports in furtherance of a particular purpose. Lastly, there must be some *conduct,* on the part of the accountants, that links them to the nonclient and evinces the accountants' understanding of the third party's reliance upon the audit. *Id.* at 551, 493 N.Y.S.2d at 443, 483 N.E.2d at 118.

A minority of states currently endorse the view of New York's "near privity" rule.[8] However, at least four jurisdictions regard *Ultramares* and *Credit Alliance* to be anachronisms.[9] These states have dis-

---

**6.** For companies whose stock is publicly traded, the accountants' work product is typically an annual audit, which is a statutory necessity under the federal securities laws. Private firms in need of capital frequently are subject to audits as well, at the insistence of potential lenders, to ensure that corporate profitability is not inflated and the borrower is creditworthy.

The accountants review the financial statements prepared by the client and issue an opinion regarding whether such statements fairly represent the financial condition of the company. If discrepancies are identified, the accountants may either demand that the error be cured in the statement or "qualify" their opinion. *See* Siliciano, *Negligent Accounting and the Limits of*

*Instrumental Tort Reform,* 86 Mich.L.Rev.1929, 1931–33 (1988).

**7.** For an explanation of GAAP, *see Godchaux v. Conveying Techniques, Inc.,* 846 F.2d 306, 313–19 (5th Cir.1988).

**8.** *See, e.g., Colonial Bank v. Ridley & Schweigert,* 551 So.2d 390 (Ala.1989); *Idaho Bank & Trust Co. v. First Bancorp,* 115 Idaho 1082, 772 P.2d 720 (1989); *Thayer v. Hicks,* 793 P.2d 784 (Mont. 1990); *Citizens Nat'l Bank v. Kennedy & Coe,* 232 Neb. 477, 441 N.W.2d 180 (1989).

**9.** *See International Mtg. Co. v. John P. Butler Accountancy Corp.,* 177 Cal.App.3d 806, 223 Cal.

pensed with privity limitations altogether, holding accountants liable for their defective work product to the extent that damages incurred by nonclients are "reasonably foreseeable."

New Jersey and California lead the effort, imposing a duty upon accountants in favor of all third parties damaged as a consequence of foreseeable reliance upon the accountants' work product. Foreseeable users of the work product include, minimally, the investing public and commercial lenders.[10] Investors and lenders make business decisions strictly upon the basis of the financial prospects of companies and, thus, they enjoy the availability of audited and accurate financial information. Traditionally, such nonclients have relied upon audits at their own risk under the *Ultramares* rule, but the alternative view is that the accounting profession is sophisticated and obligated to provide the public with accurate financial information. *See United States v. Arthur Young & Co.,* 465 U.S. 805, 818, 104 S.Ct. 1495, 1503, 79 L.Ed.2d 826 (1984) (accountants perform "public watchdog" function, requiring independence from client).

The reform states endorse more expansive liability to protect public consumers of auditing information, although accountants do not—and cannot—derive income for their work product from nonclients. Instead, reform courts view the accounting profession as holding a unique position of public trust, one that is well situated to avoid inaccuracies in financial statements. *See, e.g., H. Rosenblum, Inc. v. Adler,* 93 N.J. at 343–47, 461 A.2d at 148–49. New Jersey, in particular, believes that accountants can distribute the cost of insurance equitably to their clients, thereby shifting

losses onto the business community and its customers. *See id.* 93 N.J. at 350, 461 A.2d at 152. Reform states also maintain that a defective audit is conceptually similar to a defectively manufactured product, which may injure consumers when injected into the stream of commerce.[11]

The Restatement represents the moderate view, allowing only a restricted group of third parties to recover for pecuniary losses attributable to inaccurate financial statements. Significantly, the accountants retain control over their liability exposure. The restricted group includes third parties whom the accountants intend to influence and those whom the accountants know their clients intend to influence. Accordingly, liability is fixed by the accountants' particular knowledge at the moment the audit is published, not by the foreseeable path of harm envisioned by jurists years following an unfortunate business decision.

However, the Restatement is more generous than New York's "near privity" rule, since section 552 does not require that the accountants manifest *conduct* underscoring their understanding of a particular nonclient's reliance upon the work product. The near-privity rule, in other words, requires that the precise identity of the informational consumer be foreseen by the auditor; however, the Restatement contemplates identification of a narrow group, not necessarily the specific membership within that group.

Section 552 provides that an accountant's liability is limited to

(2)(a) ... the person or one of a limited group of persons for whose benefit and guidance [the accountant] intends to supply the information or *knows* that the

Rptr. 218 (1986); *Touche Ross & Co. v. Commercial Union Ins. Co.,* 514 So.2d 315 (Miss.1987); *H. Rosenblum, Inc. v. Adler,* 93 N.J. 324, 461 A.2d 138 (1983); *Citizens State Bank v. Timm, Schmidt & Co.,* 113 Wis.2d 376, 335 N.W.2d 361 (1983).

10. *See* Note, Raritan River Steel Co. v. Cherry, Bekaert & Holland: *Accountants' Liability to Third Parties for Negligent Misrepresentation,* 67 N.C.L.Rev. 1459, 1467 (1989) (noting heavy and

increasing public reliance upon audited financial information).

11. The court in *H. Rosenblum,* for example, remarked that it would be inconsistent to immunize accountants with contractual privity "when no such limit is imposed ... on liability for defects in products." 93 N.J. at 341, 461 A.2d at 147. Despite the comparison of professional malpractice to products liability, the court did not go so far as to hold accountants strictly liable for their "defective" audits. Pre-

recipient [client] intends to supply it; and

(b) through reliance upon it in a transaction that [the accountant] intends the information to influence or *knows* that the recipient [client] so intends or in a substantially similar transaction. [Emphasis added.]

Accordingly, the Restatement adopts the cautious position that an accountant may be liable to a third party with whom the accountant is not in privity, but not every reasonably foreseeable consumer of financial information may recover. The Restatement's approach currently constitutes the majority position, with approximately nineteen jurisdictions aligned with section 552 for the negligent misrepresentation of commercial information.[12]

Louisiana has not had the occasion to endorse any particular tort model for negligent misrepresentations attributable to accountants, presumably because "negligent misrepresentation as a legal remedy is in its infancy in Louisiana." *Josephs v. Austin,* 420 So.2d 1181, 1185 (La.App. 5th Cir. 1982), *writ denied,* 427 So.2d 870 (1983). The parties concede that Louisiana follows section 552 generally for negligent misrepresentation actions, but they disagree as to whether that section would be applied by state courts in the precise context of accountants' malpractice.

Thus, we must make an *Erie* determination of Louisiana's view of accountants in regard to negligent misrepresentation. Further, should section 552 accurately reflect Louisiana law in this case, we must also decide whether that section contemplates an accountant's *actual* knowledge, as opposed to *constructive* knowledge, regarding the consumers of its audited financial information and the nature of the transaction that the information is designed to influence.

### III.

### A.

Louisiana courts embrace the tort of negligent misrepresentation as a consequence of the broad language of La.Civ.Code arts. 2315, 2316.[13] Significantly, Louisiana has shaped the dimensions of this tort by consulting the definition adopted by the Restatement. *Dousson v. South Cent. Bell,* 429 So.2d 466, 468 (La.App. 4th Cir.), *writ not considered,* 437 So.2d 1135 (1983). Indeed, we have applied section 552 to Louisiana negligent misrepresentation cases with the understanding that the Restatement represents Louisiana law in this regard.[14]

---

sumably, the reform states have not dispensed with the element of fault.

**12.** *See Selden v. Burnett,* 754 P.2d 256 (Alaska 1988); *First Florida Bank, N.A. v. Max Mitchell & Co.,* 558 So.2d 9 (Fla.1990); *Badische Corp. v. Caylor,* 257 Ga. 131, 356 S.E.2d 198 (1987); *Chun v. Park,* 51 Haw. 462, 462 P.2d 905 (1969); *Pahre v. Auditor of State,* 422 N.W.2d 178 (Iowa 1988); *Ingram Indus., Inc. v. Nowicki,* 527 F.Supp. 683 (E.D.Ky.1981); *Law Offices of Lawrence J. Stockler, P.C. v. Rose,* 174 Mich.App. 14, 436 N.W.2d 70 (1989), *appeal denied,* 434 Mich. 861 (1990); *Bonhiver v. Graff,* 311 Minn. 111, 248 N.W.2d 291 (1976); *Mark Twain Plaza Bank v. Lowell H. Listrom & Co.,* 714 S.W.2d 859 (Mo.App.1986); *Spherex, Inc. v. Alexander Grant & Co.,* 122 N.H. 898, 451 A.2d 1308 (1982); *Raritan River Steel Co. v. Cherry, Bekaert & Holland,* 322 N.C. 200, 367 S.E.2d 609 (1988); *Haddon View Inv. Co. v. Coopers & Lybrand,* 70 Ohio St.2d 154, 436 N.E.2d 212 (1982); *Mill–Mar, Inc. v. Statham,* 278 Pa.Super. 296, 420 A.2d 548 (1980), *appeal dismissed,* 499 Pa. 219, 452 A.2d 1017 (1982); *Rusch Factors, Inc. v. Levin,* 284 F.Supp. 85 (D.R.I.1968); *Bethlehem Steel Corp. v. Ernst & Whinney,* 1989 WL 139701 (Tenn.App.1989), *permission to appeal granted, id.* (May 14, 1990); *Shatterproof Glass Corp. v. James,* 466 S.W.2d 873 (Tex.Civ.App.— Fort Worth 1971, writ ref'd n.r.e.); *Christenson v. Commonwealth Land Title Ins. Co.,* 666 P.2d 302 (Utah 1983); *TransAmerica Title Ins. Co. v. Johnson,* 103 Wash.2d 409, 693 P.2d 697 (1985); *First Nat'l Bank v. Crawford,* 386 S.E.2d 310 (W.Va.1989).

**13.** *Devore v. Hobart Mfg. Co.,* 367 So.2d 836, 839 (La.1979). Article 2315 provides,

Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.

Article 2316 states,

Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill.

**14.** *See Hot Boudin Co. v. Harrison Price Co.,* 842 F.2d 328 (5th Cir.1988) (per curiam) (unpublished) ("Louisiana applies the negligent misrepresentation standard set out in § 552 of the Restatement (Second) of Torts...."); *Abell v.*

Admittedly, no Louisiana court has had the occasion to consider the Restatement in the precise context of accountants' liability. However, we see no reason to presume that Louisiana would treat the accounting profession differently. In fact, in what we view as the analogous situation of attorneys' negligent misrepresentations, we have construed Louisiana law as limiting such malpractice liability to clients *and nonclients whom the attorneys know will rely upon their legal work product. See Abell,* 858 F.2d at 1132–33 (citing *Clause v. Manuel,* 442 So.2d 905 (La.App. 3d Cir. 1983), *writ denied,* 448 So.2d 106 (La. 1984)). That is, "attorneys, who are always responsible to their clients and to the bar and the courts for their professional actions, may control when they assume a duty to third parties for their legal opinions." *Id.* at 1133.[15]

The amici banking associations and FNBC argue that public policy requires broad accountants' liability, meriting an erosion of accountants' control over their liability to nonclients. Better yet, they contend, accountants' liability should be strict, in the same manner that product manufacturers are strictly liable to the public for defectively manufactured products injected into the stream of commerce.

We reject both arguments raised by the banking associations as being unsupportable under state law and hold that the Restatement represents Louisiana's view on the subject matter of accountants' liability. By so holding, we remain consistent with Louisiana's treatment of professional malpractice generally and avoid carving unnecessary exceptions from the state's application of section 552.

### B.

■ The conclusion that the Restatement applies in Louisiana does not readily dispose of this dispute, as the parties contest the particular state of knowledge that the alleged misinformer must possess under section 552 to create a duty in favor of nonclients. The accounting firm maintains that the Restatement contemplates *actual knowledge* regarding the future application and use of the work product. Predictably, the bank argues that the accountants need only have possessed *constructive knowledge* that the bank would rely upon the 1980 Monco audit in a commercial transaction to follow.

No Louisiana case has identified the particular knowledge contemplated by section 552 but, as the district court noted, no Louisiana court has premised liability upon the misinformer's constructive knowledge either. In other words, no Louisiana court has invoked liability because the misinformer "should have known" that its work product would negligently misrepresent the truth and would be relied upon by others in subsequent business transactions.

The Restatement expressly limits liability to a select group of nonclients who the misinformer actually knows will receive inaccurate information principally because the misinformer knows that the client will channel the work product to that restricted group. Additionally, the misinformer must know that its client intends to use the inaccurate information to influence a particular business transaction, or a "substantially similar transaction," to follow.

While section 552 may extend liability to an unnamed group of informational consumers, "it is not enough that the [misinformer] 'merely knows of the ever-present

---

*Potomac Ins. Co.,* 858 F.2d 1104, 1131 n. 33 (5th Cir.1988) ("In analyzing claims of negligent misrepresentation, Louisiana courts have referred to the Restatement (Second) of Torts."), *vacated on other grounds, sub nom. Fryar v. Abell,* — U.S. —, 109 S.Ct. 3236, 106 L.Ed.2d 584 (vacating judgment based upon unrelated issues in light of subsequent Supreme Court opinion), *cert. denied,* — U.S. —, 109 S.Ct. 3242, 106 L.Ed.2d 589 (1989); *Coastal (Bermuda) Ltd.. v. E.W. Saybolt & Co.,* 826 F.2d 424, 428–29 (5th Cir.1987) (applying § 552 to Louisiana negligent misrepresentation claim).

**15.** In *Abell,* liability was predicated upon state and federal securities claims and the Racketeer Influenced and Corrupt Organizations Act (RICO). Separate certiorari petitions were filed on these two respective issues. The Supreme Court denied certiorari on the issues relevant to the case *sub judice* but granted certiorari, vacated, and remanded on the RICO issues for further consideration in light of an intervening Supreme Court opinion. Thus, although *Abell* has been vacated, we consider it authoritative on the non-RICO issues.

possibility' that the information will be repeated to others who will rely upon it." *Hot Boudin,* slip op. at 6. In this case, the bank believes that all "potential lenders" of Monco constitute a "limited group" of informational recipients. But Arthur Young responds that not every domestic or foreign bank with a loan department falls within the kind of limited group envisioned by section 552. Further, it argues, the judiciary should not concern itself with crafting cost-shifting rules for the benefit of a sophisticated, free-riding banking industry.

The bank offers a single case as authority for the proposition that Louisiana law requires simply constructive knowledge on the part of the misinformer in order for nonclients to secure relief in a negligent misrepresentation action. In *Devore v. Hobart Mfg. Co.,* 367 So.2d 836, 839 (La.1979), the court held that school officials have no duty to represent accurately the name of the manufacturer of an exploding schoolhouse boiler to the injured plaintiff's attorney, who had sought to commence litigation against the manufacturer. The court reasoned that an employee-employer relationship does not create a duty to supply accurate information to the plaintiff's attorney. In what constitutes strictly dictum, the court added, "It cannot be presumed that [school officials] knew or *should have known* that plaintiff's attorney would rely entirely upon the information furnished, make no independent investigation, forego discovery, fail to timely file against the proper defendant, and let prescription run." *Id.* (emphasis added).

The bank suggests that the court's use of the phrase "should have known" means that section 552 requires only constructive knowledge, despite the fact that the *Devore* court never precisely addressed the knowledge contemplated by the Restatement, and the court was never occupied with the misinformers' particular state of mind. Thus, the bank's reliance upon *Devore* for the principle that section 552 requires only constructive knowledge is misplaced.

Anything less than actual knowledge, in fact, would extend liability to the bounds of "reasonable foreseeability," similar to that in New Jersey, which, as we have concluded, *supra,* has never represented Louisiana's view on negligent misrepresentation. We conclude, therefore, that the Restatement requires *actual* knowledge on the part of accountants of the limited—though unnamed—group of potential lenders that will rely upon the inaccurate 1980 audit, as well as actual knowledge of the particular financial transaction that such information is designed to influence.

Our conclusion here is reinforced by section 552's illustration 10, which is factually similar and wholly destructive of the bank's argument that tort liability extends to those with constructive knowledge of the identities of those who will rely upon the accountants' work product:

A, an independent public accountant, is retained by B Company to conduct an annual audit of the customary scope for the corporation and to furnish his opinion on the corporation's financial statements. *A is not informed of any intended use of the financial statements;* but A knows that the financial statements, accompanied by an auditor's opinion, are customarily used in a wide variety of financial transactions by the corporation and that they *may be* relied upon by lenders, investors, shareholders, creditors, purchasers and the like, in numerous possible kinds of transactions. In fact B Company uses the financial statements and accompanying auditor's opinion to obtain a loan from X Bank. Because of A's negligence, he issues an unqualifiedly favorable opinion upon a balance sheet that materially misstates the financial position of B Company, and through reliance upon it X Bank suffers pecuniary loss. A is *not liable* to X bank. [Emphasis added.]

Illustration 10, we believe, is materially indistinguishable from the instant case and convincingly supports Arthur Young's contention that it owed the bank no legal duty unless it had actual knowledge that the bank would rely upon the inaccurate audit in extending the loan.

■ The accounting firm concedes that proof of its knowledge regarding the limited group of future consumers of the 1980 audit may be made by either direct or circumstantial evidence. The bank, however, is forced to concede that no *direct* evidence is available to demonstrate that Arthur Young had actual knowledge that BNO would extend a $2.1 million unguaranteed loan to Monco. Indeed, there are no letters from Monco or Arthur Young to suggest the use of the 1980 annual audit for *any* refinancing; the Monco board minutes are silent as to any negotiations with BNO or any other bank; and the affidavits of Monco and Arthur Young's officers demonstrate that the firm never was told that the 1980 audit would be used by BNO for purposes of extending credit. Further, the BNO–Monco negotiations commenced more than three months after the 1980 audit was issued, and the discussions were conducted in private.

Circumstantially, there is a dearth of probative evidence suggesting that the Arthur Young auditors could have learned of the BNO–Monco loan negotiations prior to the default. However, the bank relies exclusively upon such circumstantial evidence in an attempt to raise a "genuine" issue regarding Arthur Young's state of knowledge and avoid summary judgment. Namely, it suggests that Arthur Young was aware that the 1979 (not 1980) audit was supplied to two potential lending banks, thus placing Arthur Young on notice that future audits would be supplied to potential lenders.

The bank also emphasizes the fact that Monco requested fifty copies of the 1980 audit, as compared to thirty-five copies for the 1979 audit. From this unremarkable fact, the jury presumably would be asked to conclude that Arthur Young understood that the fifteen extra copies would be intended for potential lenders. It is undisputed, however, that the state insurance commissions required thirty-six copies of the audit in 1980 and that Monco's share-holders and directors would use several copies.

The bank also charges, and Arthur Young concedes, that the accountants knew Montagnet wanted better terms on the FNBC–Monco loan, especially his release as a guarantor. Arthur Young argues that such a condition, which is common among guarantors, does not give it "knowledge" that certain banks other than FNBC, such as BNO, would secretly be engaged in refinancing the Monco–FNBC loan. We agree.

The combination of the circumstantial evidence offered—the distribution of the 1979 report, the request for fifty copies of the 1980 audit report, and Montagnet's lobbying effort for more favorable financing from FNBC—constitutes a "mere scintilla" of probative evidence, from which no reasonable jury could impute actual knowledge to Arthur Young, on or before the date of publication, that BNO would rely upon the 1980 report to extend $2.1 million in unguaranteed credit. There being no genuine issue regarding Arthur Young's actual knowledge, we AFFIRM the summary judgment.[16]

---

**16.** Given this result, we need not compare the Monco–FNBC and Monco–BNO loans for "sub-stantial similarity," as required by § 552 to create liability against the accountants.