United States Court of Appeals,

Fifth Circuit.

No. 94-10952.

The SCOTTISH HERITABLE TRUST, PLC and SHT Holdings (US), Inc.,
Plaintiffs-Appellees Cross-Appellants,

v.

PEAT MARWICK MAIN & CO., a partnership and KPMG Peat Marwick, a
partnership, Defendants-Appellants Cross-Appellees.

April 30, 1996.

Appeals from the United States District Court for the Northern
District of Texas.

Before REYNALDO G. GARZA, WIENER and STEWART, Circuit Judges.

WIENER, Circuit Judge:

Defendant-Appellant Peat Marwick Main & Co. (Peat Marwick)

appeals from an adverse judgment following a jury verdict that Peat

Marwick is liable to a third party for negligent misrepresentations

contained in audit reports. Concluding that Texas law does not

permit the plaintiffs to recover in these particular circumstances,

we reverse the district court's judgment and render a take-nothing

judgment in favor of Peat Marwick.

I.

FACTS AND PROCEEDINGS

The plaintiffs in this case are The Scottish Heritable Trust,

PLC (SHT/PLC) and SHT Holdings (US), Inc. (SHT(US)) (collectively,

SHT). SHT/PLC is a British conglomerate based in York, England.

SHT/PLC owns many diverse businesses around the world and has

generated annual sales in excess of $200 million. SHT(US) is a

wholly-owned subsidiary of SHT/PLC which holds companies that have

been acquired in the United States.

Through a series of stock purchases made in 1988, SHT acquired a controlling interest in Rangaire Corporation. Based in Cleburne, Texas, Rangaire's principal business is lime production. The stock of Rangaire is publicly traded on the National Association of Securities Dealers Automated Quotation System (NASDAQ).

SHT's investment in Rangaire ultimately proved to be unsuccessful. SHT now seeks to hold Peat Marwick—the auditor of Rangaire's financial statements from 1962 to 1990—liable for this loss. SHT claims that the audit reports with respect to the fiscal years ended July 31, 1987 and July 31, 1988 were deficient in that Peat Marwick issued an unqualified opinion on financial statements that materially overstated the net book value[1] of Rangaire's fixed assets. SHT further claims that its *justifiable reliance* on these faulty audit reports caused the loss which it sustained on the Rangaire stock.

The background and timing of SHT's stock purchases are important to this case. In 1985, Rangaire hired an investment banker for the purpose of locating a buyer for the company. Unable to find a willing buyer, Rangaire instead conducted a tender offer in which its Employee Stock Ownership Plan (ESOP) purchased stock from Rangaire's stockholders. The only evidence that Rangaire was for sale following this August 1986 tender offer consists of

---

[1]Book value is generally equal to the historical cost of an asset. Net book value is equal to book value less depreciation. Neither book value nor net book value is the same as fair market value.

2

testimony from a former employee that some of the "major players" in the industry toured the plant facilities as prospective purchasers.[2]

Peat Marwick issued the audit reports in question on the following dates:

| Report for the Fiscal Year Ended | Date Report Issued |
| --- | --- |
| July 31, 1987 | October 7, 1987 |
| July 31, 1988 | September 30, 1988 |

SHT acquired its controlling interest in Rangaire in the following series of transactions:

| Date | Percentage of Rangaire Purchased | Total Percentage Owned |
| --- | --- | --- |
| August 8, 1988 | 28% | 28% |
| September 30 & October 11, 1988 | 5% | 33% |
| December 14 & 15, 1988 | 17% | 50% |

SHT's initial purchase of Rangaire stock was from the bankruptcy estate of Rangaire's founder and Chairman, Eugene

---

[2]The officers and directors of Rangaire would have a fiduciary duty to consider any bona fide offer for the company. In this vein, Joseph Hill, Rangaire's former President and Chief Operating Officer, testified that Rangaire would be for sale "if the right price came along."

3

Roberts. Roberts had filed for bankruptcy in December 1987, several months *after* Peat Marwick issued the 1987 audit report. SHT had learned of the availability of the Roberts' stock in June 1988, from an investment banker who it had retained for the purpose of locating a publicly-traded U.S. company in which to acquire a block of stock.

After SHT and its investment banker made their own independent evaluation of Rangaire, SHT acquired Roberts' 28 percent interest in the company from the bankruptcy trustee. That was on August 8, 1988, approximately 11 months after Peat Marwick issued the 1987 audit report. It is undisputed that Peat Marwick had no actual knowledge of this transaction before an agreement had been reached between SHT and Roberts' bankruptcy estate.

Following this initial purchase, Robin Garland, the Chief Executive Officer of SHT/PLC, was elected to the Rangaire board of directors. As a result, Garland had access to Rangaire's internal financial records and began to receive detailed financial data. Garland was troubled to learn of certain accounting practices which had the effect of increasing the book value of the fixed assets as reflected on the financial statements. Concerned that this might be the "tip of the iceberg," Garland directed Robert Elliot—a partner with SHT/PLC's English auditors, Moores & Rowland—specifically to investigate, among other things, the fixed assets on Rangaire's books.

Elliot prepared a report dated September 20, 1988, which suggested that Rangaire's financial statements overstated the

4

proper net book value of the fixed assets. The report recommended that SHT obtain an appraisal of the fixed assets to confirm (1) their existence and (2) their cost, and advised that any related write-offs would probably be treated as a prior period adjustment. This recommendation apparently was not heeded, as SHT took no immediate action on this matter.

In late September and October 1988—after the Elliot report had been completed—SHT acquired an additional 5 percent of Rangaire. This purchase was made from Eugene Roberts' family and was described by SHT as a "courtesy," whatever that may mean.

As the months passed, SHT became increasingly dissatisfied with the management of Rangaire. In an effort to oust Joseph Hill, Rangaire's President and Chief Operating Officer, SHT decided to purchase enough additional Rangaire stock to give SHT a controlling interest in the company. This final purchase occurred in December 1988 and brought SHT's ownership in Rangaire to approximately 50 percent. As with SHT's initial purchase, it is undisputed that Peat Marwick had no actual knowledge of any of SHT's subsequent purchases of Rangaire stock prior to their respective consummations.

In January 1989, shortly after SHT had acquired a controlling interest, SHT successfully ousted Hill and named Stephen McBride, the Chief Financial Officer of SHT/PLC, to be Rangaire's President and Chief Executive Officer. During his six-month tenure as President, McBride made significant changes in the company's operations. McBride also instituted accounting policy changes.

5

These accounting changes conformed with SHT's home office policies and had the effect of reducing the net book value of the fixed assets.

During the fiscal year ended December 31, 1989,[3] Rangaire wrote off millions of dollars of fixed assets which had been reflected on prior year financial statements. During its 1989 audit, Peat Marwick agreed that generally accepted accounting principles (GAAP) permitted Rangaire to take a $12.1 million write-off. A dispute arose, however, as to whether these write-offs were properly attributable to 1989 or if instead they were attributable to errors made in prior years. McBride contended that almost all of the write-offs were the correction of prior year accounting errors.[4] Rangaire's Audit Committee, however, disagreed and concluded that most of the write-offs were properly recorded in 1989. Consequently, Rangaire decided that it was not necessary to amend its prior year financial statements that Peat Marwick had audited. From 1989 through 1992, Rangaire republished the July 31, 1987, 1988, and 1989 financial statements four times without any changes. Indeed, Rangaire's new auditors, Aronson, Fetridge, Weigle & Stern, sent Peat Marwick a "comfort letter" in 1990, as

---

[3]After SHT acquired a controlling interest, Rangaire's new management changed the fiscal year end from July 31 to December 31, to conform with SHT's year end.

[4]SHT claims that these write-offs are the result of the improper extension of the useful lives of the fixed assets, the improper capitalization of repairs, the continuation of assets on the books after they either ceased to exist or had been abandoned, and the capitalization of small assets normally expensed.

well as in 1991 and 1992, stating that it had no information to indicate that Rangaire's previous financial statements needed to be restated.

The $12.1 million write-off was publicly disclosed in October 1989. Rangaire's stock price, however, did not significantly change during the several weeks following this disclosure. During the year 1990, though, Rangaire's stock price spiraled steadily downward, and SHT suffered a substantial loss on its investment when it eventually sold the stock.

It was only then that SHT brought suit against Peat Marwick, claiming security law violations and negligent misrepresentations. The jury determined that Peat Marwick was not liable for any security law violations. On the negligent misrepresentation claim, however, the jury found against Peat Marwick and awarded $8,500,000 in damages.

Peat Marwick then moved for judgment as a matter of law or, in the alternative, for a new trial. SHT moved to strike Peat Marwick's motion for judgment as a matter of law on grounds that Peat Marwick failed to make a motion for judgment at the close of all the evidence pursuant to Rule 50(b) of the Federal Rules of Civil Procedure and that Peat Marwick's objections to the jury charge did not cure this omission.

The district court denied both SHT's motion to strike and Peat Marwick's motion for a new trial. Concluding that there was insufficient evidence to support some of the damages awarded by the jury, the district court granted in part Peat Marwick's motion for

judgment as a matter of law, reducing the judgment to $4,725,000.

Both Peat Marwick and SHT now appeal on many issues related to the negligent misrepresentation claim.  SHT does not challenge the negative jury verdict with respect to the security law claim.

## II.

## ANALYSIS

### A. STANDARD OF REVIEW

We review a jury's findings of fact under the "sufficiency of the evidence" standard.[5]  Under that standard, "[t]he verdict must be upheld unless the facts and inferences point so strongly and so overwhelmingly in favor of one party that reasonable men could not arrive at any verdict to the contrary.  If there is evidence of such quality and weight that reasonable and fair minded men in the exercise of impartial judgment might reach different conclusions, the jury function may not be invaded."[6]  A district court's application of state law is reviewed de novo.[7]

### B. WAIVER

As an initial matter, SHT argues that Peat Marwick has waived its right to challenge the sufficiency of the evidence on appeal because it failed to move for judgment as a matter of law at the

---

[5]*Granberry v. O'Barr,* 866 F.2d 112, 113 (5th Cir.1988).

[6]*Id.* (quoting *Western Co. of N. Am. v. United States,* 699 F.2d 264, 276 (5th Cir.), *cert. denied,* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983)).

[7]*Salve Regina College v. Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

conclusion of all the evidence.[8]  We disagree.

Although we acknowledge that a failure to move for judgment as a matter of law at the conclusion of all the evidence may result in a waiver of the right to challenge the sufficiency of the evidence,[9] we liberally construes Rule 50(b) of the Federal Rules of Civil Procedure.[10]  Technical noncompliance with Rule 50(b) may be excused in situations in which the purposes of the rule are satisfied.[11]  As we have often recited, the two basic purposes of this rule are "to enable the trial court to re-examine the question of evidentiary insufficiency as a matter of law if the jury returns a verdict contrary to the movant, and to alert the opposing party to the insufficiency before the case is submitted to the jury."[12] A defendant's objection to proposed jury instructions on grounds pertaining to the sufficiency of evidence issues it seeks to appeal may satisfy these purposes.[13]

After reviewing the record in minute detail, particularly

---

[8]FED.R.CIV.P. 50(b);  *McCann v. Texas City Refining, Inc.,* 984 F.2d 667, 671 (5th Cir.1993).

[9]When no timely motion has been made, we review only whether there was *any* evidence to support the jury's verdict, regardless of its sufficiency.  *Wellborn v. Sears, Roebuck & Co.,* 970 F.2d 1420, 1424 (5th Cir.1992).

[10]*See Polanco v. City of Austin,* 78 F.3d 968 (5th Cir.1996) (discussing this circuit's liberal construction of Rule 50(b)).

[11]*MacArthur v. University of Texas Health Ctr.,* 45 F.3d 890, 896-97 (5th Cir.1995).

[12]*Id.* at 897.

[13]*Purcell v. Seguin State Bank and Trust Co.,* 999 F.2d 950, 956 (5th Cir.1993);  *Jones v. Benefit Trust Life Ins. Co.,* 800 F.2d 1397, 1401 (5th Cir.1986).

Peat Marwick's motion for judgment as a matter of law made prior to the conclusion of all evidence and Peat Marwick's objections to the proposed jury charge, we are convinced that the purposes of Rule 50(b) have been served and that the district court properly denied SHT's motion to strike. Peat Marwick's objections to the jury charge adequately addressed the sufficiency of the evidence issues which it now seeks to appeal.[14] Under these particular circumstances, a holding that these issues have not been preserved on appeal would constitute a "slavish adherence" to the Rules, a position which we have repeatedly counseled against.[15] Accordingly, we conclude that Peat Marwick has not waived its right to challenge the sufficiency of the evidence on appeal.

C. ACCOUNTANTS' LIABILITY TO THIRD PARTIES FOR NEGLIGENT MISREPRESENTATION

1. *Basic Approaches*

Three basic approaches have been developed by the courts for determining the scope of accountants' liability to third parties who use and rely on their audit reports. The first approach requires either strict privity of contract or "near privity" with an auditor before he may be held liable for negligent

---

[14]Our review also convinces us that Peat Marwick's objections to the jury charge satisfy Rule 50(a)(2). We therefore reject SHT's argument that the 1991 amendments to Rule 50(a)(2) mandate a finding of waiver.

[15]*See, e.g., Bohrer v. Hanes Corp.,* 715 F.2d 213, 217 (5th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984) (stating that "[t]o demand a slavish adherence to the procedural sequence and to require these defendants, in this case, to articulate the words of renewal once the motion had been taken under advisement, would be "to succumb to a nominalism and a rigid trial scenario as equally at variance as ambush with the spirit of the rules.' ").

misrepresentation.[16] "Near privity" somewhat relaxes the requirement of actual privity of contract and requires only that (1) the accountants have actual knowledge that their reports will be used for a particular purpose; (2) the accountants have actual knowledge that a nonclient is expected to rely on the reports in furtherance of a particular purpose; and (3) there has been some conduct on the part of the accountants linking them to that party, which evinces the accountants' understanding of that party's reliance.[17] This is the most restrictive view of accountants' liability to third parties and is followed by a minority of the states.

The second approach is the "foreseeability" approach. Under this one, accountants are subject to liability to third parties much like any other tortfeasor. Thus, accountants may be held liable to any third party for negligent misrepresentation if it is reasonably foreseeable that such third party might obtain and rely on the audit report.[18] This expansive view of accountants' liability has been adopted in only a few states,[19] and some of them

---

[16]*E.g., Ward v. Ernst & Young,* 246 Va. 317, 435 S.E.2d 628, 631 (1993) (requiring privity); *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 443-44, 483 N.E.2d 110, 118 (1985) (requiring "near privity").

[17]*Credit Alliance Corp.,* 493 N.Y.S.2d at 443-44, 483 N.E.2d at 118.

[18]*E.g., Touche Ross & Co. v. Commercial Union Ins. Co.,* 514 So.2d 315 (Miss.1987).

[19]*See First Nat'l Bank v. Monco Agency, Inc.,* 911 F.2d 1053, 1058-59 (5th Cir.1990).

have recently retreated from this approach.[20]

The third approach is the one adopted by the Restatement (Second) of Torts, which provides in the relevant part:

§ 552. Information Negligently Supplied for the Guidance of Others

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>
> > (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
> >
> > (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.[21]

Although not as restrictive as the privity or "near privity" approach, the Restatement approach does not allow recovery for every reasonably foreseeable consumer of financial information.[22]

---

[20]*See Bily v. Arthur Young & Co.,* 3 Cal.4th 370, 11 Cal.Rptr.2d 51, 63, 74-75, 834 P.2d 745, 757, 769 (1992) (rejecting the foreseeability approach which had been adopted by lower courts and noting that the foreseeability approach has not attracted a substantial following and has encountered substantial criticism from commentators); *Petrillo v. Bachenburg,* 139 N.J. 472, 655 A.2d 1354, 1360 (1995) (noting that New Jersey has statutorily changed its foreseeability rule for accountants to a more restrictive test).

[21]RESTATEMENT (SECOND) OF TORTS § 552 (1977).

[22]*First Nat'l Bank v. Monco Agency, Inc.,* 911 F.2d 1053, 1060 (5th Cir.1990) (discussing application of the Restatement under Louisiana law).

Rather, the Restatement approach steers a middle course by allowing only a prescribed group of third parties to recover for pecuniary losses attributable to inaccurate financial statements. This is the approach that the majority of states have adopted. The popularity of the Restatement approach appears to be a result of many courts' finding it to be most consistent with the policy foundations underlying the tort of negligent misrepresentation.[23]

2. *Texas Approach*

Texas law governs this diversity case. Along with the majority of other jurisdictions, the Texas courts have adopted the Restatement approach with respect to accountants' liability to third parties for negligent misrepresentation.[24] Among the many issues raised in this appeal, Peat Marwick argues that the district court improperly applied Texas law when it concluded that SHT—a potential investor with respect to its initial purchase and an existing shareholder with respect to its subsequent purchases—could be a member of a "limited group" contemplated by the Restatement.

a. *Member of "Limited Group"*

---

[23]*E.g., Bily v. Arthur Young & Co.,* 3 Cal.4th 370, 11 Cal.Rptr.2d 51, 74-75, 834 P.2d 745, 769 (1992) ("The rule expressed [in the Restatement] attempts to define a narrow class and circumscribed class of persons to whom or for whom representations are made. In this way, it recognizes commercial realities by avoiding both unlimited and uncertain liability for economic losses in cases of professional mistake and exoneration of the auditor in situations where it clearly intended to undertake the responsibility of influencing particular business transactions involving third persons.").

[24]*Federal Land Bank Ass'n. v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991); *Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co.,* 715 S.W.2d 408, 411 (Tex.App.—Dallas 1986, writ ref'd n.r.e.).

### 1. *Initial Purchase*

As noted, Restatement (Second) of Torts § 552 requires that a plaintiff claiming negligent misrepresentation be the person, or a member of a "limited group" of persons, for whose benefit and guidance the defendant either intends to supply the information or knows that the recipient intends to supply it. The Restatement thus restricts the persons to whom accountants owe a duty and does not allow recovery for every foreseeable user of financial statements.[25] In its order addressing Peat Marwick's motion for judgment as a matter of law, the district court concluded that the "limited group" in this case was "potential purchasers of a controlling share of Rangaire."[26] Peat Marwick insists that this ruling is an improper application of Texas law.

SHT made its initial purchase of Rangaire stock in August 1988 from Eugene Roberts' bankruptcy estate in a privately negotiated transaction with the bankruptcy trustee. Peat Marwick had no actual knowledge of this transaction prior to its consummation, and SHT had no previous connection to Rangaire. At the time Peat Marwick issued the 1987 audit report, Roberts had not yet filed for

---

[25]*See First Nat'l Bank v. Monco Agency, Inc.,* 911 F.2d 1053, 1060 (5th Cir.1990).

[26]We are troubled by the fact that this legal determination was not announced until after the jury had entered a verdict. The jury asked for assistance on this issue while it was deliberating, but received no guidance as to the boundaries of a limited group. Even if the court's post-verdict statement were legally correct, and even if SHT fit that definition when it made its initial purchase—which is highly problematic—there is nothing to indicate that the jury had any guidance as to the limits of the group.

14

bankruptcy. As SHT simply belonged to the universe of all potential investors in Rangaire, argues Peat Marwick, SHT was not a member of a "limited group" contemplated by the Restatement as a matter of law.

In support of its argument, Peat Marwick contends that Texas would follow a number of other jurisdictions that have held potential investors not to be members of a "limited group."[27] As one court has explained, to interpret the "limited group" requirement as including all potential investors would render that requirement meaningless.[28]

Peat Marwick argues further that the district court's ruling that the "limited group" in the instant case consisted of potential purchasers of a controlling interest of Rangaire rather than all potential investors, does not save it from error. In support of this contention, Peat Marwick relies on *In re Crazy Eddie Securities Litigation,*[29] an analogous case in which Texas law also governed.

*In re Crazy Eddie* involved a situation in which the auditors knew at the time they issued the audited financial statements that

---

[27]*E.g., In re ML-Lee Acquisition Fund II, L.P.,* 848 F.Supp. 527, 556 (D.Del.1994); *In re Crazy Eddie Sec. Litig.,* 812 F.Supp. 338, 360 (E.D.N.Y.1993); *In re Sahlen & Assoc. Sec. Litig.,* 773 F.Supp. 342, 374 (S.D.Fla.1991).

[28]*In re ML-Lee Acquisition Fund II, L.P.,* 848 F.Supp. 527, 556 (D.Del.1994) (quoting *Brug v. Enstar Group, Inc.,* 755 F.Supp. 1247, 1258 (D.Del.1991)).

[29]812 F.Supp. 338 (E.D.N.Y.1993).

15

its client was "in play" as a potential take-over target.[30]  After analyzing the same Texas authorities relied on by SHT in the instant case, the district court concluded that "these cases do not suggest that Texas courts have or would find that accountants owe a duty of care to a "limited class' of future major investors seeking to acquire control, through open-market purchases, of a publicly-traded company."[31]  The court further stated that:

> Plaintiffs have not cited, and the court cannot find, a single decision by any court extending an accountant's duty of care to as-yet unidentified future open-market buyers of publicly-traded securities, even when that duty is limited to the rarified class of buyers with sufficient resources to acquire control of entire companies.
>
> This court believes that the Texas Supreme Court is unlikely to adopt a rule so universally avoided by sister states.[32]

The Texas courts have not had occasion to decide this particular aspect of the "limited group" requirement, so we must make an *Erie* guess as to how the Texas courts would come down on this issue.  Although the authorities discussed above have no binding effect on this court, we conclude that their analysis accurately represents Texas law.  To hold that a potential purchaser, even one of a controlling interest, is generally not a member of a "limited group" contemplated by the Restatement is consistent with the Restatement's objective of restricting accountants' liability to a prescribed group and not allowing

---

[30]*In re Crazy Eddie,* 812 F.Supp. at 357.

[31]*Id.* at 360.

[32]*Id.* (internal citations omitted).

16

recovery for all foreseeable users of an accountants' audit report. Moreover, the Texas courts have intimated this same view, albeit in dicta. In *Cook Consultants,* a negligent misrepresentation case in which the defendant was a surveyor, the Texas court stated that "[u]nlike, for example, future purchasers of shares of stock attempting to hold an accountant liable, [plaintiff] Larson is not a member of an unlimited class...."[33]

Relying on cases such as *Blue Bell,*[34] SHT insists that Texas law is more expansive than the Restatement approach and permits a finding that Peat Marwick owed SHT a duty in this context. We disagree.

In *Blue Bell,* the court held that *actual* knowledge of a particular plaintiff or class of plaintiffs is not necessary if the defendant should have had this knowledge.[35] To this extent, Texas law is indeed less restrictive than the Restatement. *Blue Bell,* however, in no way abandoned the "limited group" requirement. Indeed, the court expressly declined an invitation to adopt the foreseeability approach.[36]

With regard to the "limited group" requirement, the court in *Blue Bell* held that when the auditors supplied the corporation with a number of audit reports, indicating knowledge by the auditors

---

[33]*Cook Consultants v. Larson,* 700 S.W.2d 231, 236 (Tex.App.—Dallas 1985, writ ref'd n.r.e.).

[34]*Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co.,* 715 S.W.2d 408, 411 (Tex.App.—Dallas 1986, writ ref'd n.r.e.).

[35]*Id.* at 412.

[36]*Id.*

17

that third parties would be given these reports, "one of a limited number of *existing* trade creditors" was in a "limited group" so as to make summary judgment in favor of the accountants inappropriate.[37] This holding, however, falls far short of deciding that a *potential* investor with no previous connection to either the corporation or the accountant is within such group. As stated above, we conclude that such a potential investor is generally not within a "limited group" under Texas law.

SHT further insists that the question whether an accountant owes a duty to a third party is in part a fact question.[38] SHT thus makes much of the testimony of Peat Marwick partners that they knew that investors in general might rely on audited financial statements. SHT also notes that Eugene Roberts had cash flow problems many years before his filing for bankruptcy and that it is a reasonable inference to assume that he would sell his stock in the company.[39] These and similar facts and inferences, argues SHT, are enough to permit a conclusion that SHT was a member of a "limited group." We again disagree.

We acknowledge SHT's contention that the question whether an accountant owes a duty to a third party is in part a fact

---

[37]*Id.* at 413 (emphasis added).

[38]*See Steiner v. Southmark Corp.,* 739 F.Supp. 1087, 1088 (N.D.Tex1990) (Texas law).

[39]We note that Roberts received approximately $5 million dollars from the August 1986 tender offer prior to his filing for bankruptcy.

question.[40]  The outer boundaries of a "limited group" referred to in the Restatement, however, is a legal determination.  Although we do not suggest that a potential purchaser can never be a member of a "limited group," the facts in this particular case, even when viewed in a light most favorable to the jury's verdict, simply do not provide a nexus sufficient to bring a potential investor like SHT within the ambit of the "limited group" requirement.  To predicate an accountants' duty to third parties on such things as the general knowledge that accountants possess about typical investors or tenuous inferences concerning future events would be to eviscerate the Restatement rule in favor of a de facto foreseeability approach—an approach which the Texas courts have refused to embrace.

We therefore conclude that as a matter of law Peat Marwick owed SHT no duty with respect to SHT's initial purchase of Rangaire stock.

## 2. *Subsequent Purchases*

With respect to the several stock purchases following its initial purchase, SHT occupied the status of an existing minority-interest shareholder.  Peat Marwick argues that an existing shareholder, like a potential investor, also is not a member of a "limited group."  Indeed, at least one jurisdiction has accepted this argument.[41]  Nevertheless, as the other issues raised

---

[40]*See Steiner,* 739 F.Supp. at 1088.

[41]*Machata v. Seidman & Seidman,* 644 So.2d 114, 116 (Fla.App.1994), *review denied,* 654 So.2d 919 (Fla.1995).

19

on appeal by Peat Marwick even more clearly mandate a reversal in this case, we simply assume without deciding that SHT could be a member of a "limited group" with respect to its subsequent stock purchases.

## b. *Justifiable Reliance*

In addition to the "limited group" requirement discussed above, the Restatement requires that a plaintiff justifiably rely on the information that the defendant negligently misrepresents.[42] Like the Restatement, Texas law requires that a plaintiff claiming negligent misrepresentation prove that its reliance was justifiable.[43]

As the words of the phrase imply, *justifiable reliance* comprises two elements: (1) the plaintiff must in fact rely on the information; and (2) the reliance must be reasonable.[44] The justifiableness of the reliance is judged in light of the plaintiff's intelligence and experience.[45] For purposes of the tort of negligent misrepresentation, reliance is unjustified when the relying party is negligent.[46]

---

[42] RESTATEMENT (SECOND) OF TORTS § 552(1) (1977).

[43] *Airborne Freight Corp. v. C.R. Lee Enter., Inc.,* 847 S.W.2d 289, 294 (Tex.App.—El Paso 1992, writ denied).

[44] *Geosearch, Inc. v. Howell Petroleum Corp.,* 819 F.2d 521, 526 (5th Cir.1987).

[45] *See Haralson v. E.F. Hutton Group, Inc.,* 919 F.2d 1014, 1026 (5th Cir.1990).

[46] *Id.* at 1025, n. 5; *see* RESTATEMENT (SECOND) OF TORTS § 552A (1977) (barring recovery for negligent misrepresentation if the recipient of the misrepresentation is negligent in so relying).

20

Peat Marwick argues that as a matter of law SHT cannot prove justifiable reliance.  As we have concluded that SHT was not a member of a "limited group" with respect to its first purchase of Rangaire stock, we only address justifiable reliance with respect to the subsequent purchases.

SHT has vast and sophisticated experience in acquiring both public and private businesses around the world.  In addition, SHT placed its Chief Executive Officer on Rangaire's board of directors and had access to virtually all of Rangaire's internal financial records.  Well in advance of SHT's second stock purchase, Garland, SHT's CEO, learned of and was concerned by questionable accounting practices which had the effect of inflating the book value of Rangaire's fixed assets.  Garland's concerns were later confirmed by Elliot, SHT's long-time advisor.  Elliot recommended an appraisal of the fixed assets to determine their existence and cost, and advised SHT on how to treat the related write-offs.  Yet SHT now claims to have justifiably relied on Peat Marwick's negligent misrepresentations involving an overstatement of the net book value of Rangaire's fixed assets.

Given that prior to making the subsequent stock purchases, SHT (1) was an extremely sophisticated multi-national conglomerate; (2) had virtually complete access to the internal financial records of Rangaire;  and (3) suspected, and was later warned by its advisor, that a problem existed regarding the book value of fixed assets which it now complains that Peat Marwick failed to detect or disclose, we find it simply incredible that SHT could have been

justified in relying on the audit reports in question, if in fact it relied on them at all.[47]  And even when we view the evidence in the light most favorable to the verdict, we must conclude that no reasonable jury could arrive at a verdict to the contrary.[48]  We therefore hold as a matter of law that if SHT did indeed rely on Peat Marwick's audit reports with respect to its stock purchases following the initial acquisition, such reliance was simply unjustified.

D. OTHER ISSUES

As we conclude that SHT either was not within a "limited group" or lacked justifiable reliance as to all of its purchases of Rangaire stock, we need not and therefore do not address Peat Marwick's other arguments.  We note in passing, however, that some of the other issues raised by Peat Marwick, such as loss causation and damages, have considerable merit.  Similarly, we do not address SHT's arguments regarding the district court's reduction of damages, as our take-nothing judgment makes that issue moot.

III.

CONCLUSION

With respect to its first purchase of Rangaire stock, SHT was

---

[47]*See id.* at 1026 (citing *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 737 (2d Cir.1984) and suggesting that Texas courts, like New York courts, are "particularly disinclined to entertain claims of justifiable reliance when sophisticated plaintiff has access to information that would reveal fraud at a time when harm could be averted.").

[48]We cannot help but speculate that the failure to submit separate jury questions with respect to the different stock purchases may in large part explain the jury's finding.

22

not a member of a "limited group," as contemplated by the Restatement and Texas law. With respect to all subsequent purchases, SHT lacked justifiable reliance as a matter of law. Therefore under Texas law SHT is not entitled to recover against Peat Marwick for negligent misrepresentation. Accordingly, the judgment of the district court is reversed and a take-nothing judgment in favor of Peat Marwick is rendered.

REVERSED and RENDERED.