Harco Nat'l Ins. Co. v. Grant Thornton, LLP, 2009 NCBC 11.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
05 CVS 2500

HARCO NATIONAL INSURANCE
COMPANY,

Plaintiff,

v.

GRANT THORNTON LLP,

Defendant.

ORDER & OPINION

{1}     THIS MATTER is before the Court on Harco National Insurance Company's ("Harco") Motion for a Choice of Law Determination and Grant Thornton LLP's ("GT") Motion for Summary Judgment.  The Court's decision on the Motion for a Choice of Law Determination is outcome determinative for the Motion for Summary Judgment.  The Court heard oral arguments on both motions on February 12, 2009.

{2}     GT argues that Illinois law controls its liability to Harco, a third party Illinois corporation, who relied upon GT's audit, which was prepared for Capital Bonding Corporation ("CBC"), a Pennsylvania company.  GT argues that Illinois law applies because GT is an Illinois limited liability partnership, and Harco is an Illinois-domiciled and -regulated insurance company.  Conversely, Harco contends that North Carolina law applies primarily because the first loss it paid was in North Carolina, its principal officers are located here, and its parent company provided its Illinois subsidiary with the money to pay the claims at issue.

{3}     For the reasons set forth below, this Court believes that the courts of North Carolina will apply Pennsylvania law to determine the rights of a third party

to sue an auditor licensed in Pennsylvania for alleged negligent performance of an audit performed for a Pennsylvania company and disseminated in Pennsylvania. Accordingly, GT's Motion for Summary Judgment, which is based primarily on Illinois law, is **DENIED** with leave to reargue summary judgment based on Pennsylvania law.

> *Ragsdale Liggett PLLC by Mary Hulett, Ashley H. Campbell, and Jon David Hensarling for Plaintiff.*

> *Yates McLamb & Weyher, LLP by Barbara B. Weyher, Jason D. Newton, and Thomas C. Younger; Cohen & Grigsby, P.C. by Kerrin M. Kowach and Richard R. Nelson, II for Defendant.*

Tennille, Judge.

## I.

## BACKGROUND

{4}    This action was filed in Wake County Superior Court on February 23, 2005. Pursuant to Rules 2.1 and 2.2 of the General Rules of Practice for the Superior and District Courts, the case was designated complex business and assigned to the undersigned Special Superior Court Judge for Complex Business Cases by order of the Chief Justice of the Supreme Court of North Carolina on March 14, 2006.

{5}    Harco has filed claims against GT for negligence and negligent misrepresentation with regard to GT's audit of CBC's balance sheet as of December 31, 2000, and its audit of CBC's financial statements as of and for the year ending December 31, 2001. The first audit was dated June 6, 2001, and the second audit was issued under dual dates of April 5, 2002, and May 7, 2002.[1]

---

[1] For purposes of the Court's discussion of the choice of law to be applied, the terms *auditor* and *accountant*, and *audit and financial statement* and *financial information*, will be used interchangeably because it is the work product of the accountant that is at issue. The same choice of law rule should apply where an accountant is making representations with respect to the financial condition of a company without regard to the label placed on the information. There may be differences, however, in the substantive law applied depending on the circumstances.

{6}     CBC was a Pennsylvania-domiciled company whose business involved bail and immigration bonds.  CBC was not an insurance company licensed to sell bonds.  CBC, therefore, entered into "fronting" arrangements with licensed insurers who appointed CBC as their agent and allowed CBC to issue bonds in their names in return for a portion of the premiums generated by the bond sales.  CBC operated in many states, including North Carolina.  CBC is now defunct.  Harco paid millions of dollars in losses on bonds written in Harco's name by CBC as its agent.

{7}     Harco entered into the "fronting" arrangement with CBC through a Program Administrator Agreement ("PAA") that became effective on January 1, 2003.  The PAA is governed by Pennsylvania law.  The PAA identified Rolling Meadows, Illinois, as Harco's principal place of business.  Negotiations leading up to the execution of the PAA took place beginning in October 2002.[2]  Two (2) officials from Harco's parent company, Ken Coon ("Coon") and David Pirrung ("Pirrung"), visited Reading, Pennsylvania, to view CBC's operations, obtain information, and perform due diligence.  Harco maintains that CBC provided Coon and Pirrung with financial information, including the two (2) GT audits, prior to its decision to enter into the PAA.  Furthermore, Harco maintains that it relied on the GT audits in making its decision to enter into the PAA.  CBC's financial information, including the GT audits, was first provided to Harco officials in Pennsylvania and was later reviewed in various other states, including North Carolina and Nebraska, before a decision was made to sign the PAA.  Mr. Stephen Stephano ("Stephano"), a North Carolina resident, made the decision for Harco to enter into the PAA.  Ultimately, the PAA was signed by a Harco official in Nebraska.

{8}     Harco had no contact with GT at any relevant time or place.

{9}     The audits in question were performed by GT's Philadelphia office by accountants licensed to practice in Pennsylvania.  No accountant working on the audits was licensed in Illinois.

---

[2] Effective January 1, 2002, Harco wrote reinsurance for other carriers who had primary coverage on bonds written by CBC.  Harco's claims are not related to its position as a reinsurer.  Harco's reinsurance for CBC was handled out of Illinois.

{10} GT relies primarily on the following facts to support application of Illinois law. GT is an Illinois limited liability partnership. Harco is an Illinois-domiciled insurance company. It is supervised by Illinois regulators. It has principal offices and operations in Illinois. Its Annual Statements filed with the Illinois Department of Insurance identify Illinois as its statutory home office and main administrative office. CBC sent premium payments to Harco in Rolling Meadows, Illinois, and employees at the Rolling Meadows location were involved with the licensing and regulatory function of the program. The losses for which Harco seeks recovery were paid in multiple states, but paid out of the Illinois-based insurance company's bank accounts.

{11} Harco relies primarily on the following facts to support application of North Carolina law. CBC did not write any of Harco's bonds in Illinois, and no losses were paid there. Harco paid its first loss as an issuing carrier in North Carolina in early 2004, when the North Carolina Department of Insurance seized Harco's statutory deposits from its North Carolina trust account for bonds written and breached in North Carolina. Harco paid more losses in North Carolina than in any state other than New Jersey.[3] The decisions related to execution of the PAA and subsequent critical decisions were made by residents of North Carolina and employees of McM Corporation ("McM"), a North Carolina company. Primary monitoring of the CBC program was conducted out of Raleigh, North Carolina and Nebraska by McM officers. Losses were paid with funds from Harco's parent, IAT Reinsurance Company, Ltd. ("IAT"), that were transferred to Harco and then to Pennsylvania for payment to government entities with bond claims.

---

[3] The following chart shows the five states with the largest penal liability written and the largest amounts paid to courts by Harco on CBC bonds.

| STATE | PENAL LIABILITY | AMOUNT PAID |
|-------|-----------------|-------------|
| CA | $122,512,469 | $11,586,951 |
| CT | $49,872,761 | $4,938,100 |
| NC | $90,423,427 | $15, 162,614 |
| NJ | $502,602,020 | $27,841,772 |
| PA | $85,707,900 | $2,716,274 |

{12}   In essence, Harco argues that it should be treated as if it were a North Carolina company based upon its management structure for purposes of any significant relationship test and for determining which state suffered the most economic impact from the alleged negligence.  That argument is based upon the following facts: (1) Harco is a wholly owned subsidiary of IAT, a Bermuda company; (2) the officers of IAT and Harco overlap, and the primary officers reside in North Carolina; and (3) everyone who works for Harco is actually employed by McM, a North Carolina company.  The following chart shows the corporate structure of IAT:



II.

THE DIFFERING STATE STANDARDS

{13}   The choice of law issue is critical because the duty of care owed to third parties by auditors varies from state to state.  In this case, GT argues that the application of Illinois law entitles GT to summary judgment.  Each side argues for the choice of law of the state that is most favorable to its position.  It is the Court's duty to determine the choice of law issue in light of the public interest.  The Court will discuss the applicable duty of care in Illinois, North Carolina, and

Pennsylvania—the three (3) states whose law might be applied in this situation.[4]  A thorough discussion of the different state approaches to the issue of auditor third party liability can be found in *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 367 S.E.2d 609 (1988), and will not be repeated here.

## A.

## ILLINOIS

{14}   GT argues that Illinois law should apply because: (1) Harco is an Illinois corporation; (2) Harco maintains its principal place of business in Illinois; (3) Harco paid its losses from Illinois; and (4) GT is an Illinois limited liability company.  The Illinois Legislature has specifically addressed the circumstances under which auditors may be liable to persons not in privity with them.  The Illinois Public Accounting Act ("IPAA") states that a person not in privity with an auditor must show that the auditor was "aware that a primary intent of the client was for the professional services to benefit or influence the particular person bringing the action . . . ."  225 Ill. Comp. Stat. 450/30.1.  As will be seen, this is a much more stringent test than the test applied in North Carolina, but similar to states like New York, which employ a "near privity" rule.[5]

{15}   Two (2) aspects of the Illinois statute stand out.  First, it is the "primary intent of the client" that controls, and, second, that intent must be to benefit or influence "the particular person bringing the action."  225 Ill. Comp. Stat. 450/30.1. GT argues that under Illinois law Harco must prove that CBC's primary intent was to benefit Harco.  GT further alleges that Harco cannot make such a showing

---

[4] Harco has amended its Choice of Law motion to assert that Pennsylvania law is now the same as North Carolina law, and, therefore, the application of North Carolina law is appropriate.

[5] It is probably not a coincidence that states like Illinois and New York, which have large financial centers, have more stringent requirements for auditor liability.  For a recitation of the standard in New York, see *First National Bank of Commerce v. Monco Agency* Inc., 911 F.2d 1053, 1058−59 (5th Cir. 1990).  In a companion case, Harco has also sued BDO Seidman.  *See Harco Nat'l Ins. Co. v. BDO Seidman, LLP*, 05 CVS 2299 (N.C. Super. Ct.).  BDO Seidman is a New York partnership.  Thus, if the location of the head office of the accounting firm controls the choice of law decisions, then there would have been two different standards applied to virtually the same auditing conduct to determine liability.  BDO Seidman and Harco, however, have settled.  Choosing the law of the state where the audit is performed, delivered, and disseminated eliminates that result.

because Harco was not even negotiating a "fronting" agreement with CBC at the time GT prepared its audit.[6]

{16}   According the Illinois statute a strict construction, the primary intent of CBC in obtaining the audit was not to benefit Harco.  Thus, under Illinois law, GT would be entitled to summary judgment.  The Court's choice of law decision is, therefore, outcome determinative from that standpoint.  In making its decision, the Court is guided by the decision of the United States Court of Appeals for the Seventh Circuit in *Tricontinental Industries, Ltd. v. PriceWaterhouseCoopers, LLP*, 475 F.3d 824 (7th Cir. 2007), in which the Court conducted a thorough analysis of the history of accountant third party liability under Illinois law.  The *Tricontinental* Court concluded:

> In sum, the duty owed by a professional accountant to non-client third-parties is the standard articulated in [*Brumley v. Touche, Ross & Co.*, 487 N.E.2d 641 (Ill. 1985)] and codified in the [Illinois Public Accounting Act]. The [Illinois Public Accounting Act] provides that an individual accountant, partnership or firm will be liable to a third party for negligence only "if such person, partnership or corporation was aware that a primary intent of the client was for the professional services to benefit or influence the particular person." This "primary intent" may be demonstrated by "independent verification" or by other affirmative actions taken by the accountant and directed to the third party.

475 F.3d at 337–38. (*quoting Builders Bank v. Barry Finkel & Assoc.*, 790 N.E.2d 30, 38 (Ill. 2003) (internal citations omitted).  The Seventh Circuit, quoting from *Builders Bank*, further stated:

> In terms of timing, we do not read the statute to strictly require that an accountant be made aware of his client's intention to influence or benefit a third party only at the time the work product was created as defendant contends.
>
> The standard announced in [*Pelham v. Griesheimer*, 440 N.E.2d 96 (Ill. 1982)] requires that a plaintiff "prove that the primary purpose and intent of the client . . . was to benefit or influence the third party." In [*Brumley v. Touche, Ross & Co.*, 487 N.E.2d 641 (Ill. 1985)], we held

---

[6] Harco had previously been a reinsurer for companies fronting for CBC but had not received any audited statements as a reinsurer.

that the plaintiff in that case met the [*Pelham v. Griesheimer*, 440 N.E.2d 96 (Ill. 1982)] standard because he alleged that the defendant knew of the plaintiff's reliance on the defendant's reports and that the defendant had subsequently verified its accuracy. We do not, however, read [*Brumley v. Touche, Ross & Co.*, 487 N.E.2d 641 (Ill. 1985)] as *per se requiring independent verification* in order to meet the standard in [*Pelham v. Griesheimer*, 440 N.E.2d 96 (Ill. 1982)]. *Other conduct* may be sufficient to satisfy [*Pelham v. Griesheimer*, 440 N.E.2d 96 (Ill. 1982)].

*Tricontinental*, 475 F.3d at 836–37 (*quoting Builders Bank*, 790 N.E.2d at 37) (emphasis in original).

{17}  In this case, then, it was not necessary for GT to know at the time it performed the audit that the audit would be relied upon by Harco. There is, however, no evidence that GT had *any* communication with Harco, much less verified its prior audit to Harco. Nor is there any "other conduct" or affirmative action taken by GT directed to Harco that is sufficient to satisfy the requirements of the IPAA. In *Builders Bank*, the accountant played an active role in securing the loan for the client from the bank. *See* 790 N.E.2d at 33. The accountant knew that his work was being used specifically to influence the plaintiff bank's loan decision. *See id.* No such evidence is present here. The Court in *Builders Bank* went on to issue the following caution:

> We further caution that our holding is limited to the facts of this case and we are not expanding the scope of the statute. We decline to announce an affirmative duty on the part of accountants to seek out third parties for an indeterminate period of time after their work is prepared, repudiating it because the accountant becomes aware, however tangentially, that it may be used to influence or benefit a third party.

*Builders Bank*, 790 N.E.2d at 37.

{18}  The Court notes that under Illinois law, accountants and attorneys may be held to a different standard than land surveyors, even though land surveyors are treated as professionals. *See Rozny v. Marnul*, 250 N.E.2d 656, 660–63 (Ill. 1969). For a discussion of the history of professional liability standards in Illinois, see *Tricontinental*, 475 F.3d at 834–38 and *Builders Bank*, 790 N.E.2d at 35–37. It

may be that there should be, and are, different standards for liability based upon the profession or the type of professional work being done. Counsel for the parties should address that possibility when discussing the current state of the law in Pennsylvania.

B.

NORTH CAROLINA

{19} There is no dispute about the standard applied in negligent misrepresentation cases involving accountants and auditors in North Carolina. North Carolina falls squarely in the majority of states that apply the *Restatement (Second) of Torts* § 552 (1977),[7] having rejected both a privity or near-privity rule and a reasonable foreseeability test. The seminal case is *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 367 S.E.2d 609 (1988). Chief Justice Exum, writing for the Court, had the following to say about why the Court chose the middle ground of the Restatement rather than either of the two (2) ends of the spectrum:

> Because of the accountant's inability to control the distribution of his report, as well as his lack of control over some of the statements he assesses, a standard which limits his potential liability is appropriate.
>
>      . . . .
>
> An accountant performs an audit pursuant to a contract with an individual client. The client may or may not intend to use the report

---

[7] The *Restatement (Second) of Torts* § 552 provides in pertinent part:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) . . . [T]he liability stated in Subsection (1) is limited to loss suffered

    (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

    (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

for other than internal purposes. It does not benefit the accountant if his client distributes the audit opinion to others. Instead, it merely exposes his work to many whom he may have had no idea would scrutinize his efforts. We believe that in fairness accountants should not be liable in circumstances where they are unaware of the use to which their opinions will be put. *Instead, their liability should be commensurate with those persons or classes of persons whom they know will rely upon their work.* With such knowledge the auditor can, through purchase of liability insurance, setting fees, and adopting other protective measures appropriate to the risk, prepare accordingly.

> . . . .

> We conclude that the standard set forth in the *Restatement (Second) of Torts* § 552 (1977) represents the soundest approach to accountants' liability for negligent misrepresentation. It constitutes a middle ground between the restrictive [*Ultramares Corp. v. Touche, Nivens & Co.*, 255 NY 170 (1931)] approach advocated by defendants and the expansive "reasonably foreseeable" approach advanced by plaintiff's [sic]. It recognizes that liability should extend not only to those with whom the accountant is in privity or near privity, but also to those persons, or classes of persons, whom he knows and intends will rely on his opinion, or whom he knows his client intends will so rely. On the other hand, as the commentary makes clear, it prevents extension of liability in situations where the accountant "merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon [the audited financial statements], on the part of anyone to whom it may be repeated." *Restatement (Second) of Torts* § 552, Comment h. As such it balances, more so than the other standards, the need to hold accountants to a standard that accounts for their contemporary role in the financial world with the need to protect them from liability that unreasonably exceeds the bounds of their real undertaking.

*Raritan River Steel Co.,* 322 N.C. at 213–15, 367 S.E.2d at 616–17 (emphasis added).

{20} Chief Justice Exum acknowledged that the *Restatement (Second) of Torts* § 552 had not been uniformly applied. *Raritan River Steel Co.,* 322 N.C. at 215, 367 S.E.2d at 617. The decision appears to hold that the Restatement does not require that the accountant be informed by the client himself of the audit's intended use.

The text requires only that the auditor *know* that his client intends to supply information to another person or limited group of persons. Whether the auditor acquires this knowledge from his client or elsewhere should make no difference. If he knows at the time he prepares his report that specific persons, or a limited group of persons, will rely on his work, and intends or knows that his client intends such reliance, his duty of care should extend to them.

*Id.* at 215, 367 S.E.2d at 618 (emphasis in original).

{21} *Raritan* was on appeal from a Rule 12(b)(6) ruling so the court was deciding whether a legally sufficient claim had been stated. The Court concluded:

Applying the Restatement test to Sidbec-Dosco's complaint, we conclude Sidbec-Dosco has stated a legally sufficient claim against defendants for negligent misrepresentation. Sidbec-Dosco alleges that when defendants prepared the audited financial statements for IMC they knew: (1) the statements would be used by IMC to represent its financial condition to creditors who would extend credit on the basis of them; and (2) plaintiff and other creditors would rely upon these statements. These allegations are sufficient to impose upon defendants a duty of care to Sidbec-Dosco under the Restatement approach as we have interpreted and adopted it herein.

*Id.* at 215–16, 367 S.E. 2d at 618.

{22} As it appears from the quoted text above, the difficult question in North Carolina is where the courts will draw the line when there is no actual knowledge on the part of an auditor of a use by a specific third party in a specific transaction.[8] Having rejected both reasonable foreseeability and near privity as appropriate tests, the North Carolina Supreme Court created a middle ground that is not clearly defined, but will be refined on a case-by-case basis. *Raritan* appears to hold that suppliers who furnish substantial goods on credit to the audit client are a category of users that auditors know would be given their audit reports and would rely upon them. *Id.* at 215–16, 367 S.E. 2d at 618. How auditors know their audit statements

---

[8] The same difficulty will arise if Pennsylvania uses the *Restatement (Second) of Torts* § 552. Whether there are criteria the courts should use in deciding if a particular user falls within a category of protected users is a question counsel should address in subsequent summary judgment briefs.

will be relied upon appears to be a matter to be addressed at summary judgment or, perhaps, at trial.

{23}   Thus, since North Carolina law applies a more lenient standard to determine the scope of auditor liability, but not a reasonably foreseeable test, the outcome could be different than it would be under Illinois law.

C.

PENNSYLVANIA

{24}   For the reasons set forth below, the Court has concluded that North Carolina would apply the law of Pennsylvania under the circumstances presented by this case.  The Court notes that the parties did not agree that Pennsylvania law would apply under North Carolina's choice of law rules when filing their previous briefs, and, therefore, questions under Pennsylvania law have not been fully addressed by the parties, particularly GT.  Summary judgment motions are currently scheduled for briefing.  In those briefs the parties should address summary judgment applying Pennsylvania law.  There appears to be at least an open question as to whether Pennsylvania would apply the *Restatement (Second) of Torts* § 552 to accountants' liability given the decision in *Bilt-Rite Contractors, Inc. v. The Architectural Studio,* 866 A.2d 270 (Pa. 2005), in which the Pennsylvania Supreme Court applied *Restatement (Second) of Torts* § 552 to determine the scope of liability for architects.

{25}   Counsel should address the current state of Pennsylvania law in their forthcoming summary judgment briefs.[9]  They should address not only address the questions of what standard Pennsylvania will apply, but also how that standard would be applied given the facts of this case.  If Pennsylvania does adopt *Restatement (Second) of Torts* § 552, what "knowledge" of the accountant will be required?

---

[9] See *Excavations Techs, Inc. v. Columbia Gas Co.*, 936 A.2d 111 (Pa. 2008), for possible guidance.

## III.

## THE CHOICE OF LAW ISSUE

{26}   Clearly, the choice of law in this case has the potential to be outcome determinative.  Accordingly, the Court has carefully considered which state's laws should govern the liability issues in this case.  That procedural decision itself is governed by North Carolina law.  *Boudreau v. Baughman,* 322 N.C. 331, 335, 368 S.E.2d 849, 853–54 (1988).  The Court has concluded that, under the circumstances that exist in this case, North Carolina courts would apply the law of Pennsylvania.

{27}   The question of which state's laws should govern the scope of liability for accounting firms and auditors when they are alleged to have negligently performed their services is a difficult one.  The difficulty arises from the dual nature of the claims made against accountants.  Although the third party claims are generally couched in tort terms of negligence or negligent misrepresentation, they are strongly analogous to contract breach of warranty claims.  The accountant's contract is with his client; yet we expect accountants to be our public watchdogs.  *See U.S. v. Arthur Young & Co.*, 465 U.S. 805, 817–18 (1984) (noting the "'public watchdog' function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust.").  The claims seldom, if ever, involve claims of personal injury, but almost always involve monetary or economic loss.

{28}   In essence, accountants are asked to warrant that their work is done with Generally Accepted Accounting Practices ("GAAP") and Generally Accepted Auditing Standards ("GAAS").  When an auditor breaches that warranty, that action can give rise to a breach of contract claim by the client and a negligent misrepresentation claim by a third party, both based on exactly the same conduct.  Third parties must invoke a negligent misrepresentation claim because they are not privy to the contract between auditor and client.

{29}   Those states that wish to restrict the scope of accountant liability as a matter of public policy do so by limiting the categories of people who may rely on the accountant's work, whether by requiring privity or limiting the scope of the

accountant's duty of care to those in privity. The scope of accountant liability is likely to be revisited in light of the current banking and economic crisis. Litigation involving accountants increased as a consequence of the nation's savings and loan crisis in the late 1980s and early 1990s. *See First Nat'l Bank of Commerce v. Monco Agency, Inc.*, 911 F.2d 1053, 1058 n.5 (5th Cir. 1990) (noting that litigation "has recently become more pronounced as a consequence of this nation's saving and loan crisis").

{30} The law of the state where an audit is performed, delivered, and disseminated (the "Audit State") should control the scope of liability to third parties not in privity with an accountant. In this case that state is Pennsylvania.

{31} There are two (2) main reasons to apply an Audit State test. First, the Audit State has the most significant public policy interest in the liability of auditors performing audits within the state for local companies. North Carolina certainly has a significant state interest in the liability of auditors performing audits in North Carolina. Additionally, the Audit State is interested in (1) setting auditor's standards of performance, (2) the cost of local audits, and (3) the well being of the local companies being audited.

{32} Second, application of the state law where an audit is performed, delivered, and disseminated is the most logical choice because it provides clarity, certainty, and consistency for the auditing profession and those relying on the auditor's work. Providing consistency for the accounting profession permits accountants to engage in risk analysis and pricing with greater certainty, thus reducing transaction costs and lowering the overall cost of auditing services, which are vital to the economy. That was one of the Supreme Court's goals in adopting the *Restatement (Second) of Torts* § 552 standard. *See Raritan River Steel Co.,* 322 N.C. at 215, 367 S.E.2d at 617.

{33} Concomitantly, application of the state law where an audit is performed, delivered, and disseminated provides consistency and certainty to businesses relying on audits. Specifically, a choice of law rule based upon the state of performance, delivery, and dissemination notifies businesses relying on an audit

which state's law will apply to their claims should the audit be negligently performed, thus promoting clearer risk analysis for the user as well.

{34}    Using the law of the state where the injury occurred is problematic. Specifically, it is debatable where the injury occurs when third parties from various states rely on the audits.  Moreover, using the law of the state where the party relied on the audit is equally problematic.  The result could be random depending on the location where the actual "reliance" takes place.  Ultimately, using the law of the state where the audit is performed, delivered, and disseminated eliminates randomness in the result and applies the same standard to all.

{35}    Here, Harco claims its injury resulted from entering into the "fronting" arrangement pursuant to which it ultimately had to pay on its bonds written by CBC as agent.  The financial information it alleges it relied upon was disseminated in Pennsylvania by CBC.

{36}    Our Supreme Court has emphasized two (2) important factors in making choice of law determinations:  (1) public policy and (2) the need for clarity, certainty, and consistency.  *See Boudreau*, 322 N.C. at 335–42, 368 S.E.2d at 854–58.  Justice Martin's opinion in *Boudreau* provides clear guidance and is particularly instructive in this case because it deals with not only the place of injury test in tort but also the most significant relationship test in warranty cases.  As noted above, auditor liability cases sound in both tort and warranty.  They involve a contract between auditor and client.  They do not fit neatly into either category and deserve special consideration based upon the principles previously applied by our courts.

{37}    *Boudreau* was a personal injury/products liability case that contained both negligence and breach of warranty claims.  *See id.* at 333, 368 S.E.2d at 852. Plaintiff, a Massachusetts native, was injured visiting friends in Florida when he cut himself on a chair manufactured in North Carolina and sold through a furniture store in Florida.  *See id.*  In addressing the negligence claims, the Supreme Court said the following about the choice of law in pure tort cases:

> Our traditional conflict of laws rule is that matters affecting the substantial rights of the parties are determined by lex loci, the law of

> the situs of the claim, and remedial or procedural rights are determined by lex fori, the law of the forum. *For actions sounding in tort, the state where the injury occurred is considered the situs of the claim.* Thus, under North Carolina law, when the injury giving rise to a negligence or strict liability claim occurs in another state, the law of that state governs resolution of the substantive issues in the controversy.
>
> *This Court has consistently adhered to the lex loci rule in tort actions.* We note that this continues to be the majority rule in the United States. We see no reason to abandon this well-settled rule at this time. *It is an objective and convenient approach which continues to afford certainty, uniformity, and predictability of outcome in choice of law decisions.*

*Id.* at 335–36, 368 S.E.2d at 853–54 (internal citations omitted) (emphasis added).

{38} In choosing which state law to apply to the warranty claims, however, the Court applied the "most significant relationship" test. *Id.* at 338, 368 S.E.2d at 855. Although the decision is based upon specific choice of law provisions in the Uniform Commercial Code dictating application of the law of the state with an "appropriate relation" to the transaction, the rationale applied by the Court in deciding which state had the "most significant relationship" is instructive.

> Applying this analysis to the case at bar, we find Florida – the place of sale, distribution, delivery, and use of the product, as well as the place of injury – to be the state with the most significant relationship to the warranty claim.
>
> Commentators have suggested that the law of the place of distribution should be supreme in products liability cases. This is particularly true with respect to breach of warranty claims. A state's interest in enforcing warranties involves protection of its citizens from commercial movement of defective goods into that state. The state in which a sales contract is consummated has a significant interest in applying the social and economic policies embodied in its own law of warranty.

*Id.* at 338–39, 368 S.E.2d at 855–56 (internal citations omitted).

{39} Just as the state in which a sales contract is consummated has a significant interest in applying the social and economic policies embodied in its own

law of warranty, the Audit State has a significant interest in applying the social and economic policies embodied in its own laws governing local accountant conduct and liability. A state's interest in enforcing sound accounting practices protects its citizens from dissemination of defectively prepared financial information and audits. The wide divergence of state laws governing accountant liability to third parties demonstrates that it is a sensitive public policy issue. *See First Nat'l Bank of Commerce*, 911 F. 2d at 1058 ("The lack of uniformity among the states is attributable to a schism in public policy regarding the measure of liability accountants should bear in favor of third parties for the business errors attributable, in whole or in part, to their work product.").

{40} The Court notes that if this case were a pure contract case involving the contract between GT and CBC, there would be no doubt that Pennsylvania law would apply since the contract was made, performed, and governed by Pennsylvania law. *See Bernick v. Jurden*, 306 N.C. 435, 442, 293 S.E.2d 405, 410 (1982). Pennsylvania is clearly the state with the most significant interest in the underlying contract between CBC and GT.

{41} The application of either a place of injury test or a significant relationship test does not necessarily result in a different outcome. Reasonably, Plaintiff and Defendant argue for the choice of law that is most favorable to their side. Neither makes a compelling argument that Illinois or North Carolina was the place of injury or the state with the most significant relationship.

{42} In the circumstances of this case, the place of injury can be approached in many different ways. It is undisputed that the audit was performed, delivered, and disseminated in Pennsylvania. The work was done by Pennsylvania auditors for a Pennsylvania company. If the audit done for CBC was defective, the negligent act giving rise to all claims was the delivery of the audit to CBC. The heart of Harco's claim is that it was induced into entering into the fronting agreement with CBC by the allegedly defective audit. It is certainly arguable and entirely plausible that the injury occurred when the "fronting" agreement was entered into, not when Harco honored its obligations under the bonds. Harco was injured when it entered into

the contract that required it to pay on bonds in the future.  The money it paid out on the bonds was the result of its entering into the Pennsylvania law governed contract.  The final payments were made through CBC even though it was not CBC's money that was lost.  Harco officials went to Pennsylvania to do their due diligence.  They got the allegedly defective information there, and that allegedly caused them to enter into the "fronting" agreement.

{43}   The factors the parties point to in their "place of injury" and "significant relationship" arguments suffer from the same deficiency: They produce inconsistent, random, unpredictable, and uneven results.  Using the home office of the users of an audit as the place of injury can result in inconsistencies and inequalities.  Audits may be disseminated to multiple sources, both within the audited company's home state and outside it.  Should there be a difference in recovery depending on whether the home office of one company relying on an audit is in New Jersey and the home office of another company relying on the audit is in New York?  The Court finds no good reason for such a result.  Using an Audit State approach insures that everyone relying on the financial information is treated the same, including the company that contracted for the work in the first place.

{44}   Moreover, use of the "principal office" of the accounting firm is also unappealing.  Such a standard would simply result in a race to the bottom with accounting firms selecting the state with the most protective laws as its "home office."  Such an approach ignores the reality that most of the work is done by local offices and not controlled from a home office.  This case presents a clear example of the inconsistency that can be created.  BDO Seidman took over CBC's work after GT.  BDO Seidman is a New York partnership.  It was sued for its work for CBC.  Would it make sense to apply a different standard of liability based solely on where the headquarters of GT and BDO Seidman were located?  Use of the Audit State test would provide consistency and equality under those circumstances.

{45}   The Audit State test also solves another problem.  Few third party users will know the principal place of business or state of domestication of a large accounting firm.  Using the Audit State test makes it easy for third parties to know

which state's law will be applied because they will know the location of the company to which the accountants have provided the information, where the work was performed, and where it was disseminated.

{46} The Court is also uncomfortable with a test based upon where a first loss was paid by an insurance company. That kind of test results in totally random results and lends itself to forum shopping. In this case, if the first loss had been paid in California, a state with virtually no connection to the transaction but where lots of bonds were written, the standard applied would be significantly different from the standard in Illinois, North Carolina, or Pennsylvania. While the magnitude of losses paid in any one state could in some circumstances be significant, it is not in this case. No payments were made in Illinois; payments were made in many states, and North Carolina was not the recipient of the largest payment, nor the state where the most bonds were written. All payments were made as a result of bonds written by the Pennsylvania company.

{47} The Court was particularly uncomfortable with Harco's arguments that it should look to Harco's management structure or the inter-company transfer of funds in resolving significant relationship issues. Such an approach is fraught with difficulty and would promote inconsistency and unnecessary work for the courts. Where an insurance company organizes itself under the laws of one state and submits itself to regulation in that state, there should be little argument that its principal place of business is there and not where its officers may live or work.

{48} In the case of audits, the state with the most significant relationship to the audit is the state in which the audit is performed. Here, that state is Pennsylvania. It has a significant interest in the standards of performance of audits of its corporate citizens and distribution of the audits by either the auditor or the client. It also has a significant interest in the basis of liability for auditors working within its borders. Thus, the guidance from our Supreme Court holds that in warranty type claims, the state with the most significant relationship is the place of sale, distribution, delivery and use. *Boudreau*, 322 N.C. at 338, 368 S.E.2d at 855–56.

GT's work was not only performed in Pennsylvania for a Pennsylvania company by Pennsylvania auditors, but also delivered, used, and disseminated in Pennsylvania.

{49}   North Carolina has signaled its public interest in auditor liability by specifically adopting *Restatement (Second) of Torts* § 552 and emphasized the need for consistency in *Raritan.  See* 322 N.C. 200, 367 S.E.2d 609 (1988).

IV.

CONCLUSION

{50}   This Court believes that whether a "significant relationship" or a "place of injury" test is applied, Pennsylvania law should apply in this case.  Neither side explored the application of Pennsylvania law to the facts of this case in depth, and there may be some open questions about Pennsylvania law.  Defendant's Motion for Summary Judgment was based solely on application of Illinois law.  Accordingly, Defendant's Motion for Summary Judgment is **DENIED** with leave to readdress summary judgment based upon application of Pennsylvania law.

{51}   The courts of North Carolina will treat allegedly defective audits as similar to defective products and will apply the law of the state where an audit is performed, delivered, and disseminated—the Audit State test—in determining accountant/auditor liability for negligent preparation of financial information.  The Audit State test fulfills both a place of injury and significant relationship test.  Furthermore, the Audit State test provides the certainty and consistency our courts strive for, and it applies the law of the state with the greatest public policy interests in the outcome.

{52}   All three approaches to choice of law—place of injury, place of contract or performance, and significant relationship—point to the law of the Audit State as the law that should be applied.  In this case, therefore, Pennsylvania law should be applied.

{53}   Counsel shall have thirty (30) days from the date of this Order & Opinion to file post-discovery dispositive motions and accompanying briefs.  Counsel shall then have twenty (20) days from the filing of the post-discovery dispositive motions

and accompanying briefs to file any responsive briefs.  Reply briefs will not be necessary.

{54}   Rosement Reinsurance Ltd. shall have thirty (30) days from the date of this Order & Opinion to file any amicus brief.

**IT IS SO ORDERED**, this the 20th day of April, 2009.